No. 66,809

STATE OF KANSAS, *Appellee*, v. GREGORY RAYMOND HARKNESS, *Appellant*.

(847 P.2d 1191)

Opin-
ion filed March 5, 1993.

*Hazel Haupt,* assistant appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, was with her on the brief for appellant.

*Michael Warner,* assistant district attorney, argued the cause, and *Paul J. Morrison,* district attorney, and *Robert T. Stephan,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by the defendant, Gregory Raymond Harkness, from his conviction of four counts of aggravated kidnapping, three counts of rape, one count of aggravated sodomy, and three counts of aggravated assault.

The three separate incidents out of which the charges arose took place on the 2nd, 4th, and 5th of June, 1981. Harkness was convicted in 1982 and committed to Larned State Security Hospital. He was returned to the trial court and sentenced in January 1991. This appeal followed.

The primary issue at trial was whether Harkness was insane. On appeal Harkness argues he was not mentally competent to stand trial or at the sentencing; the evidence was insufficient for the jury to find he was sane; Instruction No. 10 impermissibly

shifted the burden of proof to the defendant; the trial court erred in excluding from evidence letters written by Harkness between the dates of the crime and trial; and the three counts of aggravated assault are multiplicitous with his convictions for aggravated kidnapping.

At the time of trial, the four female victims ranged in age from 14 to 20 years of age. Harkness was 19 years of age. He had a lengthy history of mental illness that included multiple hospitalizations.

The defendant did not dispute he committed the acts. His explanation was that God told him to commit the acts. The facts will be set forth only as necessary in discussing the various issues.

## I. COMPETENCY AT TRIAL AND SENTENCING

Harkness argues the trial court abused its discretion in determining he was competent to stand trial and to be sentenced. The defendant claims that, because of this abuse of discretion, he was deprived of his liberty without due process under the Fourteenth Amendment to the United States Constitution.

A defendant is incompetent to stand trial if, because of mental illness or defect, that individual is unable "[t]o understand the nature and purpose of the proceedings against him [or her]" or "to make or assist in making his [or her] defense." K.S.A. 22-3301(1). In *State v. Holloway*, 219 Kan. 245, 254, 547 P.2d 741 (1976), we stated that our incompetency standard is in accord with *Dusky v. United States*, 362 U.S. 402, 4 L. Ed. 2d 824, 80 S. Ct. 788 (1960). According to the *Dusky* Court, the " 'test must be whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.' " 362 U.S. 402. Additionally, K.S.A. 22-3302(1) provides:

"At any time after the defendant has been charged with a crime and before pronouncement of sentence, the defendant, the defendant's counsel or the prosecuting attorney may request a determination of the defendant's competency to stand trial. If, upon the request of either party or upon the judge's own knowledge and observation, the judge before whom the case is pending finds that there is reason to believe that the defendant is incompetent to stand trial the proceedings shall be suspended and a hearing conducted to determine the competency of the defendant."

"On appeal, the reviewing court's inquiry on a trial court's determination that a defendant is competent to stand trial is whether the trial court abused its discretion." *State v. Perkins,* 248 Kan. 760, Syl. ¶ 4, 811 P.2d 1142 (1991). " 'Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable person would take the view adopted by the trial court.' [Citation omitted.]" *State v. Grissom,* 251 Kan. 851, 931, 840 P.2d 1142 (1992).

On July 15, 1981, the trial court granted the defendant's motion for a psychiatric evaluation to determine his competency to stand trial and ordered the defendant committed to the Larned State Security Hospital. On September 4, 1981, the trial court ruled that Harkness was not competent to stand trial. The court indicated its ruling was based upon Larned's report "that on occasions Mr. Harkness was unable to maintain a coherent conversation, was hallucinating, appeared to be confused, somewhat disoriented and bewildered, schizophrenic paranoid with acute exacerbation. Concentration was disrupted, attention span inadequate." The court ordered his return to Larned for "continued treatment and pharmaceutical assistance." The defendant's competency was to be reevaluated within three months. On December 3, 1981, the trial court ruled that Harkness was competent to stand trial. According to the court, this time the report from Larned concluded that Harkness "had been restored to capacity" and was able to "participate in the preparation of his defense and the assistance of counsel in his defense."

The reports upon which the trial court based its December 1981 ruling are not part of the record on appeal. Therefore, it is impossible to determine whether the trial court abused its discretion in so ruling. "An appellant has the burden of furnishing a record which affirmatively shows that prejudicial error occurred in the trial court. In the absence of such a record, we presume that the action of the trial court was proper." *State v. Edwards,* 250 Kan. 320, Syl. ¶ 7, 826 P.2d 1355 (1992).

Additionally, Harkness raises for the first time on appeal the issue of whether there should have been a third evaluation of his competency to stand trial. The defendant was in receipt of the

report upon which the trial court based its December 1981 ruling. He lodged no objection to the report or to the trial court's ruling and presented no evidence to rebut the report's conclusions. Harkness did not ask for a redetermination of competency at any time throughout the trial. He did not raise any due process concerns to the trial court. "Where constitutional grounds for reversal are asserted for the first time on appeal, they are not properly before the appellate court for review." *State v. Walker*, 244 Kan. 275, Syl. ¶ 6, 768 P.2d 290 (1989).

Harkness is arguing that, based upon the trial court's knowledge and observations, the trial court, *sua sponte*, should have ordered a new competency determination. See K.S.A. 22-3302(1). He contends there was ample evidence for the trial court to make a finding of incompetency and the court abused its discretion in failing to do so. The defendant advances several reasons to support his argument: his extensive prior psychiatric history; his behavior at arraignment and at trial during a discussion about readback testimony; and, most importantly according to the defendant, because he was on psychotropic medication, his competency was synthetically produced and, as such, should be invalid. Psychotropic has been defined as "affecting the mind, denoting drugs used in the treatment of mental illnesses." Stedman's Medical Dictionary 1288 (25th ed. 1990).

The defendant's parents testified about his prior psychiatric history. Harkness had been in and out of counseling and mental facilities as well as on and off medication from the time he was an adolescent until committing these crimes in June 1981. He began experiencing problems in junior high: His grades began to drop; he was picked up on different occasions for using marijuana, drinking beer, and stealing a bicycle; he began getting into physical fights with other children; he began lying to his parents; and he became belligerent and refused to follow orders. He eventually dropped out of high school.

According to his parents, Harkness began hearing voices. In response to these voices, on one occasion he walked about his parents' house with a loaded shotgun, which caused his parents to remove all guns from the house. He thought people were watching him and could hear what he was thinking. The defendant eventually believed the voices he heard were either God or Satan.

He developed a pattern of going outside and praying at the top of his voice, sometimes on the roof of the house in the middle of the night. His mother referred to it as "raving and hollering to God" to "forgive him for being a faggot." He generally was unable to hold a job for more than two or three days. His parents refused, based upon medical advice, to let him drive their car unless one of them was with him because he was unable to concentrate for any length of time.

Considerable expert and lay testimony was presented concerning the defendant's mental health and his prior psychiatric history. A defendant is not incompetent to stand trial simply because that individual has received or needs psychiatric treatment. *Van Dusen v. State,* 197 Kan. 718, 725-26, 421 P.2d 197 (1966).

With regard to his behavior, Harkness emphasizes that, at his arraignment, he attacked a female court reporter in a courtroom full of people. The defendant also points to his behavior after the jury requested a readback of the two experts' testimony. Defense counsel questioned the defendant about whether he wanted to be present at the readback or whether he wanted to waive his right to be present. The record reflects that Harkness was confused about his options and the ramifications of each and that he had a difficult time making a choice. The defendant also emphasizes defense counsel's response to his question about what he would be doing if he was present for the readback. Defense counsel said: "Sitting there at the counsel table, just like you have been sitting all week, twiddling your thumbs while [the court reporter] reads." Harkness maintains this underscores the fact he was incapable of assisting in his own defense.

The trial court also had the opportunity to observe Harkness' conduct, attitude, and demeanor at trial. It must be presumed the trial court considered all of this and did not find the defendant's competency wanting. Attacking a court reporter, showing confusion, having difficulty making decisions, and twiddling one's thumbs are not necessarily signs of incompetency. There are other plausible explanations.

"It is the trial court in whose mind a real doubt of sanity or mental capacity to properly defend must be created before that court is required to order an inquiry solely on its own initiative. The necessity for an inquiry under such circumstances addresses itself to the discretion of the court and

its decision will not be disturbed in the absence of abuse of sound judicial discretion." *Van Dusen,* 197 Kan. 718, Syl. ¶ 6.

We cannot say the trial court abused its discretion in failing to order a third evaluation of Harkness' competency or to find the defendant incompetent to stand trial because of his psychiatric history or behavior at trial.

Harkness contends that, because he was on psychotropic medication, his competency was synthetically produced and, as such, should be invalid. The defendant argues competency should be based upon an accused's natural, undrugged state. His argument should not be confused with issues involving compelled competency, in which a defendant is or has been compelled to take medication against his or her will. See *U.S. v. Charters,* 863 F.2d 302 (4th Cir. 1988) (en banc), *cert. denied* 494 U.S. 1016 (1990); Perlin, *Are Courts Competent to Decide Competency Questions?: Stripping the Facade from United States v. Charters,* 38 Kan. L. Rev. 957 (1990). Compelled competency is not an issue in this appeal.

Although the defendant cites no authority to support his argument, commentators have addressed the issue. One commentator contends two issues arise if a defendant is under the influence of antipsychotic drugs: Is the defendant competent? Can a medicated defendant receive a fair trial? The commentator suggests a trial court should consider whether the defendant is suffering from side effects because of the medication and whether such side effects will prejudice the jury. A court also should consider if the defendant's appearance prejudices the jury. Note, *Antipsychotic Drugs and the Incompetent Defendant: A Perspective on the Treatment and Prosecution of Incompetent Defendants,* 47 Wash. & Lee L. Rev. 1059 (1990); see Fentiman, *Whose Right is it Anyway?: Rethinking Competency to Stand Trial in Light of the Synthetically Sane Insanity Defendant,* 40 U. Miami L. Rev. 1109 (1986). Another commentator contends a defendant synthetically restored to competency should not be presumed incompetent because the defendant is on medication. Instead, upon the defendant's return to court, the trial court should individually determine this defendant's competence. Winick, *Psychotropic Medication and Competence to Stand Trial,* 1977 Am. B. Found. Research J. 769, 815. See generally Wilkinson & Rob-

erts, *Defendant's Competency to Stand Trial,* 40 Am. Jur. Proof of Facts 2d 171 §§ 1-25 (1984).

Here, Harkness did not raise the issue to the trial court. Therefore, the trial court was not requested to make findings such as those just discussed. Furthermore, the use of psychoactive drugs to treat mentally ill persons and to restore competence is widespread. Winick, at 771. We hold a defendant is not per se incompetent because he or she has been restored synthetically to competency through the use of psychotropic or other medication. *Cf. Holloway,* 219 Kan. at 254 ("the use of narcotics does not *per se* render a defendant incompetent to stand trial"). To hold otherwise would cause unjust results. For instance, this defendant, and countless others with the same defect who are convicted of a felony requiring a 1-5 year sentence, could be confined in a mental institution for life because they might never be competent to be sentenced without being on medicine. It would be inhumane to deny the use of the medicine.

Additionally, the statutory definition of competence does not preclude the use of psychotropic medication to restore the defendant's ability to understand the proceedings against him or her or to make or assist in making his or her defense. The trial court did not abuse its discretion in finding Harkness competent to stand trial even though the defendant was taking psychotropic medication.

With regard to sentencing, on June 28, 1982, the trial court, pursuant to K.S.A. 22-3430 and K.S.A. 22-3431, ordered the defendant committed to Larned until further order of the court. In November 1990, the trial court determined, based upon reports generated by the staff at Larned and pursuant to K.S.A. 22-3431, that Harkness should be released from Larned and sentenced. The defendant was sentenced on January 2, 1991.

K.S.A. 22-3430 authorizes a trial court, in lieu of imprisonment, to commit a defendant to a state mental institution if the defendant "is in need of psychiatric care and treatment and [if] such treatment may materially aid in his rehabilitation and [if] the defendant and society [are] not likely to be endangered by permitting the defendant to receive such psychiatric care and treatment." K.S.A. 22-3431 provides, in pertinent part:

"Whenever it appears to the chief medical officer of the institution to which a person has been committed under K.S.A. 22-3430 and amendments thereto, that such person is not dangerous to self or others and that such person will not be improved by further detention in such institution, such person shall be returned to the court where convicted and shall be sentenced, committed, granted probation, assigned to a community correctional services program or discharged as the court deems best under the circumstance."

Harkness contends the trial court abused its discretion in sentencing him because the reports from the Larned staff indicated he was dangerous to others. He argues K.S.A. 22-3431 requires that, before he is sentenced, it must be determined he "is not dangerous to self or others and that [he] will not be improved by further detention in such institution."

The October 23, 1990, letter to the trial court from Dr. G.W. Getz, clinical director at Larned, stated:

"Mr. Harkness has been cared for and treated, and his case was reviewed in a Forensic Staff Conference on September 12, 1990. The diagnoses of his condition were established as Schizophrenia, Paranoid, Chronic; Alcohol Abuse, in full remission; Cannabis Abuse, in full remission; and Psychoactive Substance Abuse Not Otherwise Specified.

"It is the opinion of the professional staff at State Security Hospital that Mr. Harkness has received maximum benefit from treatment in this facility. Since the provisions of K.S.A. 22-3430 are designed to allow convicted criminal defendants to receive needed psychiatric treatment in lieu of imprisonment, such defendant should only remain at State Security Hospital for as long as further psychiatric treatment may be of reasonable benefit. *State v. Smith*, 3 Kan. App. 2d 179 (1979).

"Although the prediction of future human behavior can never be a matter of certainty, the staff concluded that Mr. Harkness is dangerous to others in the community due to the nature of the crimes committed.

"Because Mr. Harkness is seen as dangerous to others, it is recommended that you now consider having him sent to Lansing Correctional Facility where he will be kept apart from society for the time being. Eventually Mr. Harkness should be considered for a sex offenders treatment program, and such a program is not available at State Security Hospital at the present time."

Harkness argues reliance upon *State v. Smith*, 3 Kan. App. 2d 179, 591 P.2d 1098 (1979), is erroneous because the holding in *Smith* is contrary to the language of K.S.A. 22-3431. The defendant in *Smith* was committed to Larned upon conviction of fe-

lonious assault and criminal damage to property. Two years later, the clinical director at Larned informed the trial court

" 'that Mr. Smith is not amenable to psychiatric treatment, that continued detention at State Security Hospital will not materially contribute to his rehabilitation, that he is a potentially dangerous person, that the Kansas State Penitentiary is the most suitable place for an individual with his particular behavior pattern, and that he is ready to be returned to your court for further legal disposition.' " 3 Kan. App. 2d at 179-80.

In construing K.S.A. 22-3431, the Court of Appeals held:

"K.S.A. 22-3431 provides but one method whereby a person committed under 22-3430 may be returned to the court for further appropriate disposition. That statute does not preclude further orders of the court of jurisdiction with respect to the disposition to be made of defendant."

"Where the chief medical officer of an institution is unable to report that defendant is not dangerous to himself or others and that he would not be improved by further detention, but does indicate that defendant is not amenable to psychiatric treatment and that continued detention would not materially contribute to his rehabilitation, the trial court in which defendant was convicted is authorized to direct the return of defendant for sentencing."

"The district court in which a defendant is convicted and thereafter committed under the provisions of K.S.A. 22-3430 retains jurisdiction over the defendant, and may by its further order inquire into the merits of continued commitment for psychiatric care and treatment. If defendant is not found to be amenable to such care and treatment, that court may sentence or make such other provisions for defendant as provided by law and as may be warranted by the facts and circumstances disclosed. In doing so, the court must exercise the same discretion as in directing the initial commitment." 3 Kan. App. 2d 179, Syl. ¶¶ 1-3.

For our purposes, the language of the 1979 version of K.S.A. 22-3431 construed by the *Smith* court and the version applicable to this case is identical.

If the legislature disagreed with the Court of Appeals' interpretation of K.S.A. 22-3431, the legislature has had 13 years to amend the statute accordingly and has not done so. It is obvious from the clinical director's letter that Larned relies upon this case in determining when to recommend that a defendant is ready to be sentenced. From a policy viewpoint, it makes little sense to keep a convicted defendant at a state security hospital after it has been determined the defendant will no longer benefit from the available treatment. Harkness offers no persuasive reason for this court to overrule *Smith*. The trial court did not abuse its

discretion in sentencing the defendant rather than continuing his commitment even though Larned determined he was dangerous to others.

The defendant again argues that, because his restoration to competence was induced through the use of psychotropic medication, the trial court abused its discretion in finding him competent for sentencing. We reject that argument for the same reasons stated concerning Harkness' competence to stand trial.

## II. SANITY WHEN CRIMES COMMITTED

Harkness contends the evidence was insufficient for a jury to find beyond a reasonable doubt that he was sane at the time the crimes were committed. At trial, his sole defense was insanity.

Kansas follows the *M'Naghten* test. "Under the *M'Naghten* test for criminal insanity, a defendant is to be held not criminally responsible where he does not know the nature and quality of his act or where he does not know right from wrong with respect to that act." *State v. Baker*, 249 Kan. 431, Syl. ¶ 10, 819 P.2d 1173 (1991). The jury was instructed accordingly.

The standard of review for insufficient evidence claims is well established:

"When the sufficiency of evidence is challenged, the standard of review on appeal is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *Baker*, 249 Kan. 431, Syl. ¶ 11.

With regard to the burden of proof in a sanity case, we have stated:

" ' " '[T]he state is not required in the first instance to introduce evidence to prove sanity, for the law presumes that all persons are sane, and this presumption of sanity takes the place of evidence in the first instance. It answers for evidence of sanity on the part of the state. But if evidence is introduced which tends to shake this presumption, the jury must then consider the same, and its effect upon the main issue of guilty or not guilty, and if upon considering the whole of the evidence introduced on the trial, together with the presumption of sanity, the presumption of innocence, and all other legal presumptions applicable to the case under the evidence, there should be a reasonable doubt as to whether the defendant is sane or insane, he must be acquitted. . . . [The defendant] is required only to raise a reasonable doubt as to his guilt. The burden of proof is always upon the

state, and never shifts from the state to the defendant.' " ' [Citations omitted.]" *Baker,* 249 Kan. at 450-51.

The evidence was conflicting whether Harkness was sane when the crimes were committed in June 1981. The State presented evidence from Dr. Charles Donaldson Glazzard, a psychiatrist in private practice; from the victims; and from police officers. The defense presented testimony from Harkness' parents and from Dr. William V. McKnelly, an associate professor in psychiatry at the University of Kansas Medical Center. A jury may consider the testimony of both expert and lay witnesses on the issue of insanity. *Baker,* 249 Kan. 431, Syl. ¶ 12.

Dr. Glazzard, after examining the police reports and medical records from the various hospitals at which the defendant had been treated, as well as interviewing the defendant, concluded that Harkness knew the difference between right and wrong. The doctor gave the following reasons for his conclusion:

"History reveals from the medical records, and from Mr. Harkness specifically, that the concept of right and wrong was known by him as he was growing up.

. . . .

"Mr. Harkness recalls being told by parents, and being disciplined if he went against what he was told, about the difference between right and wrong when he was young, a youngster.

"At the time of the events, Mr. Harkness feels that he was under the pressure of God telling him to do certain things.

"At the same time he stated that he had been told earlier by God, when he was at K.U. Medical Center, to do those things, literally to commit rape, but didn't want to do it because he was afraid then of what might happen to him, essentially saying that was not right to do that.

"On this occasion he apparently waited two weeks after having heard the voice again to tell him to do the rapes, because at the times he might have approached a girl, there were too many people around, he was afraid of being caught.

. . . .

"[T]he fear of being caught suggested that knowing that what he was about to do was wrong and that it might lead to punishment for him.

. . . .

"[F]rom the records, from the police records, and from our communication, Mr. Harkness took precautions to avoid being seen while driving to the areas where he was, during the act, the alleged act.

"And Mr. Harkness allegedly ran away following the event or the incidents. He apparently concealed his gun, according to the records.

"One of the girls apparently screamed and Mr. Harkness covered her mouth to prevent her from screaming.

"Mr. Harkness said, when I asked him more directly about the incidents that, quote, 'I knew it was wrong, but I was told to do it, or I might go to hell.' Unquote.

"Larned records, in terms of knowing the difference between right and wrong, having to do with feeling guilty, for example, about certain acts, suggests that he was aware of the difference between right and wrong, saying, one, 'I'm guilty. I don't know why, I just did it. I wouldn't call myself crazy, I just wanted to do it.'

"And later on demonstrated guilt feelings on the part of previously sexual activities, knowing the difference in his mind between right and wrong.

"And in the psychological testing August 19, 20, [1981] when asked if he knew that rape was illegal, he said, 'Yes, I like to touch girls and look at them.' "

Dr. Glazzard acknowledged the defendant was suffering from mental illness, the most recent diagnosis at Larned being schizophrenia, which the doctor described as "a split between thoughts and feelings." According to Dr. Glazzard, the fact that Harkness had been diagnosed as schizophrenic did not mean that he, per se, was unable to distinguish between right and wrong.

One of the victims, T.K., testified that, during the approximately two and one-half hours she was with Harkness, his conversation was responsive and appropriate. She never saw any indication the defendant did not know what he was doing. She believed that he knew the difference between right and wrong and that he knew what he was doing was wrong because he lied about his name, concealed the gun, lied about where they were going, blindfolded her so she could not look at him, and ran away. The State emphasizes that the testimony of all the victims indicated the defendant was "lucid, conversant and plan or goal-directed in his behavior toward them."

One of the officers searching for the suspect testified that as he was driving in his vehicle he saw Harkness walking along the shoulder of the road. The officer had been given a physical and clothing description of the suspect. When the officer slowed down, the defendant ran. The officer shouted for Harkness to stop; however, the defendant paid no attention. Shortly thereafter, Harkness pointed a gun in the officer's direction. The officer fired at the defendant, but missed. Although Harkness escaped then, he was arrested shortly thereafter.

Harkness' father testified that he did not believe his son knew right from wrong part of the time and that the only time he believed his son could control his actions was if his son was on his medication. The defendant's mother testified that her son was not taking his medication on June 2, 1981. She also said she did not believe her son knew the difference between right and wrong because he was following what he thought were God's orders. When she questioned him about what had happened prior to his being sent to Larned for evaluation, he told her, "God told me to do it."

Dr. McKnelly testified that through the years he has been asked, usually by the State, many hundreds of times to determine whether a defendant was insane. He said that in only 5 to 10 cases did he believe a defendant was insane. According to the doctor, Harkness is an incurable schizophrenic and "will not know the difference between right and wrong now or in the foreseeable future, unless he is medicated, and even then it's equivocal." Dr. McKnelly stated, "He's as crazy as they come." The doctor acknowledged that, prior to interviewing the defendant personally, he thought it highly unlikely, based upon the medical records, that the defendant knew the difference between right and wrong.

Harkness argues the key to whether he could understand the nature and quality of his acts was whether he was medicated sufficiently at the time the crimes were committed to overcome the hallucinations from which he suffered. He relies upon the testimony of his witnesses, particularly Dr. McKnelly, to argue the evidence was insufficient for a jury to find him sane. The defendant's argument fails to take into account the testimony of the State's witnesses. In essence, he is arguing credibility of the witnesses. It is not a function of this court to judge credibility.

After reviewing all the evidence, there is substantial evidence, viewed in the light most favorable to the prosecution, for a rational factfinder to conclude that Harkness knew the difference between right and wrong and was not insane at the time of committing these offenses.

### III. PRESUMPTION OF INTENT INSTRUCTION

Over the defendant's objection, the trial court gave the following presumption of intent instruction:

"Instruction No. 10

· "It is reasonable to presume that a person ordinarily intends the natural and probable consequences of his knowing acts. The jury may draw the inference that the defendant intended all of the consequences which one standing in like circumstances and possessing like knowledge should reasonably have expected to result from such intentional act or conscious omission.

"Any such inference drawn must be considered along with the other evidence in the case in determining whether the State has met the burden to prove every element of the offense beyond a reasonable doubt and that the defendant possessed the required criminal intent. This burden never shifts to the defendant."

The trial court noted that Instruction No. 10 was one of the · "stock instructions," based upon PIK Crim. 2d 54.01 (1992 Supp.). Instruction No. 10 was not based upon PIK Crim. 2d 54.01 (1992 Supp.) and is wide of the mark. The defendant maintained the instruction would confuse the jury on the issue of intent.

On appeal, Harkness argues Instruction No. 10 shifted the burden of proof to him because the instruction created a compulsory, rather than permissive, inference. He points out Instruction No. 10 did not follow the approved language of PIK Crim. 2d 54.01 (1992 Supp.), which provided:

"Ordinarily a person intends all of the usual consequences of his voluntary acts. This inference may be considered by you along with all the ‚other evidence in the case. You may accept or reject it in determining whether the State has met its burden to prove the required criminal intent of the defendant. This burden never shifts to the defendant."

One significant difference, according to Harkness, is that Instruction No. 10 contained the language, "Any such inference drawn *must* be considered." He maintains the use of the word *must* made the inference compulsory, not permissive. The defendant claims further proof is that Instruction No. 10 failed to include the following language, "You may accept or reject" the inference, found in the PIK instruction. He maintains that, because the instruction did not allow the jury to choose whether to accept or reject the inference, the inference became a "mandatory rebuttable presumption." He claims this "mandatory rebuttable presumption" undermined his insanity defense because it juxtaposed the concept of voluntary intent with the concept of insanity with-

out explaining that the two concepts are not necessarily mutually exclusive.

In *State v. DeVries,* 13 Kan. App. 2d 609, 613-14, 780 P.2d 1118 (1989), the Court of Appeals summarized the law in this area, stating:

"The State is required by the Due Process Clause of the Fourteenth Amendment to prove, beyond a reasonable doubt, every element necessary to constitute the crime with which an accused is charged. *In re Winship,* 397 U.S. 358, 364, 25 L. Ed. 2d 368, 90 S. Ct. 1068 (1970). Under this principle, evidentiary presumptions cannot be included in the jury instructions if they have the effect of relieving the State of its burden of proof beyond a reasonable doubt of every essential element of a crime. *Sandstrom v. Montana,* 442 U.S. 510, 61 L. Ed. 2d 39, 99 S. Ct. 2450 (1979). In order to decide whether such an instruction is unconstitutional, a court must decide whether the instruction creates a mandatory or rebuttable presumption or merely a permissive inference. *Francis v. Franklin,* 471 U.S. 307, 313-14, 85 L. Ed. 2d 344, 105 S. Ct. 1965 (1985).

"A presumption may be either mandatory or rebuttable. A mandatory presumption removes the presumed element from the case once the State has proven the predicate facts giving rise to the presumption. That is, once the State proves certain facts, a jury must infer intent from such facts and the accused cannot rebut the inferences. 471 U.S. at 314.

"A rebuttable presumption does not remove the presumed element from the case but nevertheless requires the jury to find the presumed element unless the accused persuades the jury otherwise. That is, once the State proves certain facts, the jury must infer intent from those facts, unless the accused proves otherwise. Both types of presumptions are unconstitutional if they relieve the State of its burden of persuasion on an element of an offense or if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury. *Francis v. Franklin,* 471 U.S. at 314; *Sandstrom v. Montana,* 442 U.S. at 517-18.

"By contrast, an instruction containing a permissive inference does not relieve the State of its burden because it still requires the State to convince the jury that an element, such as intent, should be inferred based on the facts proved. *Francis v. Franklin,* 471 U.S. at 314.

"The standard for reviewing an instruction such as the one in the instant case is whether a reasonable juror could have understood the instruction as a 'presumption that shifted to the defendant the burden of persuasion on the element of intent once the State had proved the predicate acts.' 471 U.S. at 316. If a reasonable juror could have understood the instruction in the present case as shifting the burden of proof on intent to the defendant once the State proved the defendant committed certain voluntary acts, the instruction is unconstitutional. 471 U.S. at 316.

"The allegedly unconstitutional instruction must be read and interpreted in light of all the instructions given, since other instructions might cure the

defective language in the instruction. 471 U.S. at 315. General instructions on the presumption of the defendant's innocence or the State's burden of persuasion, however, do not remedy an erroneous instruction containing a conclusive or rebuttable presumption on an essential element. 471 U.S. at 319-20."

See *State v. Green,* 245 Kan. 398, 410, 781 P.2d 678 (1989).

The defendant has misinterpreted the instruction, which states, "The jury *may* draw the inference," and if it does, "such inference drawn *must* be considered along with the other evidence in the case." (Emphasis added.) Although the instruction could have been worded better, it did not create a mandatory or rebuttable presumption. Confusion, if any existed, was clarified by the final sentence of Instruction No. 10, which states: "This burden never shifts to the defendant." This sentence was taken verbatim from PIK Crim. 2d 54.01 (1992 Supp.). Furthermore, Instruction No. 8 informed the jury that the State has the burden of proof and that the defendant is not required to prove his innocence. Additionally, the jury was instructed to construe all instructions together and to apply them as a whole to the evidence. A reasonable juror would not have interpreted Instruction No. 10 as shifting the burden of proof on intent to Harkness once the State proved he committed certain voluntary actions. The instruction is not unconstitutional.

Harkness also contends Instruction No. 10 permitted jurors to override the insanity defense because the instruction referred to "standing in like circumstances and possessing like knowledge." He uses this language as proof the jury instructions, as a whole, emphasized physical actions over state of mind. The defendant claims that, as a result, the jury could convict him despite conclusive evidence that he was insane.

As discussed in the previous issue, the evidence was not conclusive the defendant was incapable of distinguishing right from wrong at the time of committing the crimes. Additionally, the jury was instructed it *"may* draw the inference that the defendant intended all of the consequences which one standing in like circumstances and possessing like knowledge should reasonably have expected to result from such intentional act or conscious omission." (Emphasis added.) The jury was not required to make the inference. The defendant's arguments are not persuasive.

## IV. LETTERS HARKNESS HAD WRITTEN

Harkness contends the trial court erred in refusing to admit Defense Exhibit "H" into evidence. This exhibit consisted of letters the defendant wrote to his family while he was at Larned for an evaluation of his competency to stand trial. The letters covered a period of time from the first of August until the first of December 1981. Defense counsel asked to make a proffer, which the trial court granted, and to leave the letters with the court reporter for the purpose of appeal. The record before us does not show a proffer was made, and the letters are not part of the record.

The State's initial objection to the letters was on the grounds of hearsay. Harkness argued that the letters were not being offered to show the truth of the matter, but to show his mental state. The trial court withheld its ruling, allowing the State to review the letters. The State subsequently objected to the letters on hearsay and relevancy grounds. In response, Harkness contended that the letters had some probative value concerning his state of mind. The trial court sustained the State's objection, reasoning the letters were immaterial because it was the defendant's state of mind at the time of committing the offenses, not his subsequent condition, that was important in determining whether the *M'Naghten* test was satisfied.

On appeal, Harkness argues the letters were relevant because they were offered to show his "clearing mental state . . . after the administration of psychotropic medication, and by inference, [his] mental state when not medicated." " 'Relevant evidence' means evidence having any tendency in reason to prove any material fact." K.S.A. 60-401(b). The defendant contends the material fact the defense sought to prove was that in his unmedicated state he was unable to distinguish between right and wrong. He argues that, because the trial court refused to admit the letters into evidence, he was unable to present his defense.

In discussing relevancy, we have stated: "To render evidence of collateral facts competent, there must be some natural, necessary, or logical connection between them and the inference or result they are designed to establish." *State v. Friberg*, 252 Kan. 141, Syl. ¶ 6, 843 P.2d 218 (1992). Harkness failed to establish

that connection. When he attempted to proffer the letters, he only argued that the letters were being offered to show his state of mind. He did not elaborate. The defendant argued for the first time in his post-trial motion for a new trial, which was denied, that the letters were being offered "for the purpose of showing the confusion that existed in [his] mind early on when he went down to the hospital, and how that seemed to clear up as his medication took hold." Furthermore, when Harkness attempted to enter the letters into evidence, there was no specific mention that he was receiving psychotropic medication during his stay at Larned. The record on appeal does not indicate if the defendant was receiving psychotropic medication when he wrote the letters and, if so, how much medication he had received when he wrote such letters. The record on appeal also is vague concerning when Harkness last took his medication prior to committing the crimes. His mother testified that he told her on June 2, 1981, that he was not taking medication. June 2, 1981, is the date of the first kidnapping and attack. It is not known when he last took the medication, how long the drug stays in the system, and if he took medication on the dates the other crimes were committed.

In *State v. Garcia,* 233 Kan. 589, Syl. ¶ 5, 664 P.2d 1343 (1983), this court held that evidence of the defendant's behavior subsequent to the commission of the alleged crimes is relevant to the insanity issue only if such evidence assists in determining the defendant's mental condition at the time the alleged crimes were committed. In *Garcia,* the defendant wanted to admit into evidence videotapes of an interview between him and his expert witness, a clinical psychologist. At a hearing on whether to admit the tapes, the psychologist said that he relied upon the tapes, in part, in reaching his conclusion that the defendant did not know the difference between right and wrong at the time the crimes were committed and that the tapes would be useful in explaining his diagnosis and conclusions to the jury.

This court upheld the trial court's refusal to admit the tapes, reasoning:

"Here the videotapes were offered by the [defendant] to support [the psychologist's] opinion concerning the [defendant's] mental condition at the time the crimes were committed. It is highly possible that the jury would be misled by the evidence and misuse it in considering the issue of insanity

on the night in question, rather than limiting its use to support the basis of [the psychologist's] opinion. Furthermore, . . . the jury does not possess the training, skill or experience to analyze the behavior of the [defendant] exhibited during the interview and interpret from it his mental condition at the time the crimes were committed. The strong possibility of misuse of the evidence by the jury outweighs whatever probative value the evidence may have had in lending support to [the psychologist's] conclusions. In addition, the admission of this evidence would have placed before the jury the issue of the validity of the expert's conclusions and would have required them to evaluate whether, based upon that evidence, those conclusions were proper. This the jury was not qualified to do." *Garcia,* 233 Kan. at 601.

Harkness attempts to distinguish the instant case from *Garcia,* contending that the same concerns are not present here. He focuses upon only one of the concerns discussed in *Garcia,* that being that the jury might mistake the defendant's state of mind as evidenced on the videotapes for his state of mind at the time the crimes were committed. Harkness argues that the letters were offered to show how the medication improved his state of mind, not to show "aberrant behavior." The defendant also claims the letters are more reliable than the *Garcia* videotapes because the letters were not elicited for examination purposes.

We find Harkness' contention unpersuasive. There is just as much possibility the letters would have misled the jury in this case as the videotapes would have misled the *Garcia* jury. The jury could have mistaken Harkness' state of mind at the time of writing the letters for his state of mind at the time of committing the crimes. The jury would have been placed in the inappropriate position of collaterally evaluating the validity of the experts' conclusions. The jury lacked the expertise to interpret the letters in relationship to the defendant's state of mind at the time the crimes were committed.

"Admission or exclusion of evidence is within the sound discretion of the trial court, subject to exclusionary rules." *Friberg,* 252 Kan. 141, Syl. ¶ 5. Here, the trial court did not abuse its discretion in refusing to admit the letters into evidence.

### V. MULTIPLICITY

Harkness argues that his convictions for the aggravated assault of M.P., M.F., and T.K. are multiplicitous with his convictions for the aggravated kidnapping of the same three victims. He claims the convictions are multiplicitous because the State relied

upon the same act, that of threatening each victim with his gun, to supply the "threat" element for each crime.

"Multiplicity exists when the State uses a single wrongful act as the basis for multiple charges. Charges are not multiplicitous . . . when the offenses occur at different times and in different places."

"A test for determining whether a continuous transaction results in the commission of but a single offense is whether separate and distinct prohibited acts, made punishable by law, have been committed. A single motive for a series of acts does not necessarily result in a single crime." *State v. Woods,* 250 Kan. 109, Syl. ¶¶ 6, 7, 825 P.2d 514, *cert. denied* _____ U.S. _____, 121 L. Ed. 2d 100 (1992).

To convict the defendant of aggravated assault, the jury was instructed the State had to prove that Harkness intentionally threatened bodily harm to the victim, that he had the apparent ability to cause such bodily harm, that his conduct resulted in the victim being in immediate apprehension of bodily harm, that he used a deadly weapon, and that the crime occurred on a specific date. To convict the defendant of aggravated kidnapping, the jury was instructed the State had to prove that Harkness took the victim by force or threat, that it was done with the intent to hold the victim to facilitate flight or the commission of any crime, that bodily harm was inflicted, and that the crime occurred on a specific date.

With regard to M.P., the defendant walked up to her car window, pointed a gun at her, and told her to move over. M.P. testified that she was frightened. A jury could find that at this point the crime of aggravated assault upon M.P. was complete. Harkness then entered M.P.'s car and assumed control of the vehicle by driving it. He drove away from the location of the aggravated assault. While he was driving around, he kept his gun pointed at M.P. A jury could find that Harkness took M.P. by force or threat by commandeering her vehicle or by keeping the gun pointed at her while he was driving. In addition, when Harkness and M.P. reached the scene where the rape occurred, Harkness parked the car in a driveway in front of a vacant house. He left the keys in the car and went to the rear of the house. M.P. started the car and tried to leave. Unfortunately, the car became stuck and she was recaptured. She then was taken from the car and raped. In *State v. James,* 216 Kan. 235, 531 P.2d

70 (1975), a young woman forcibly was dragged from her car and then escaped. She quickly was recaptured and raped. This court held the assault and battery in dragging her from the car was separate from the rape and not multiplicitous. The element of taking M.P. by force or threat for the aggravated kidnapping charge and the threat element for the aggravated assault charge occurred at different times and in different places. The convictions are not multiplicitous.

For the same reason, the defendant's argument fails with regard to the convictions for the aggravated assault and the aggravated kidnapping of M.F. As with M.P., the aggravated assault was complete before Harkness entered the vehicle. M.F. was a passenger in a parked car. Harkness approached the vehicle from the passenger side and held a pistol to M.F.'s head. He subsequently opened the car door and sat in the back seat. Unlike the situation with M.P., the defendant did not drive the car. He forced the driver, D.A.F., at gunpoint to drive to a deserted wooded area, where he eventually attacked both women. There was a break of some 15 minutes during which M.F. was far enough away from Harkness that she could neither see nor hear him. Harkness then forcibly took the two women back to the car and ultimately released them in town. We are satisfied that separate acts of force were used and that the charges are not multiplicitous. The element of taking M.F. by force or threat for the aggravated kidnapping charge and the threat element for the aggravated assault charge occurred at different times and in different places.

The aggravated assault of T.K. is a different matter. In her case, the testimony was that she voluntarily had given Harkness a ride. T.K. had no reason to suspect anything was wrong until Harkness pulled a gun. When the gun first appeared, T.K. was driving south on I-35 near 75th Street in Johnson County, Kansas. T.K. was directed to and did drive directly to the place where she shortly thereafter was raped. The defendant then forced T.K. to return to the car. Harkness drove and had started back to town when he was involved in a minor traffic accident. He fled and subsequently was captured.

In *State v. Racey*, 225 Kan. 404, 408, 590 P.2d 1064 (1979), the defendant was convicted of aggravated assault and kidnapping.

This court reversed his aggravated assault conviction because a single continuing act of force could not form the basis for both crimes. Our result relied upon *State v. Lassley,* 218 Kan. 758, 761-62, 545 P.2d 383 (1976), in which this court previously had stated:

"Both the kidnapping and rape charges required proof of the element of force. In each instance the force was supplied by evidence of the conduct of defendant in ordering the victim to do acts under the implied threat of harm. The fact defendant had a knife in his hand was significant in establishing the force element of both crimes. This same act of force cannot also provide the basis for the charge of aggravated assault. . . . The conduct of defendant in the instant case constitutes a single continuous transaction in which two separate and distinct offenses were committed. The act cited by the prosecution as constituting the offense of aggravated assault was part of the act of kidnapping and a prelude to the act of rape. In sum, this case presents a situation where there was a continuous act of force on the part of defendant. The act which was relied on for the charges of rape and kidnapping cannot also be used to provide the basis of a separate offense. We hold therefore that the trial court erred in refusing to dismiss the charge of aggravated assault."

In *Lassley,* a young woman was baby-sitting when the defendant entered the home, forced her outside at knife point and subsequently took her to some nearby shrubs and raped her. In *Racey,* after the victim had allowed Racey to enter her car, he pulled a gun. The victim was directed from the city of Pittsburg to a location near the Kansas-Missouri border, and the victim was rescued while the car was parked at that location.

The *Racey* case is nearly identical to the facts of the crimes against T.K. The same act of force was used in the aggravated assault and kidnapping charge and that act of force was continuous and unbroken. For the reasons stated in *Lassley* and *Racey,* we conclude the conviction for the aggravated assault of T.K. (Count X) should be reversed.

Here, the trial judge sentenced Harkness to four life terms on the four kidnapping counts. Three of the life terms are concurrent to each other and consecutive to the fourth life term. The remaining seven counts, which includes Count X, all run concurrent to the fourth life sentence. Thus, reversing Count X (aggravated assault) will have no effect on Harkness' sentence and the trial

judge can vacate the sentence on Count X without Harkness being present.

Affirmed in part, reversed in part, and remanded with directions to vacate the sentence imposed on Count X.