No. 86,258

STATE OF KANSAS, *Appellee*, v. MARCUS D. CLEMONS, *Appellant*.

(45 P.3d 384)

Opinion filed April 19, 2002.

*Peter Maharry*, assistant appellate defender, argued the cause, and *Jessica Kunen*, chief appellate defender, and *Steven R. Zinn*, deputy appellate defender, were with him on the briefs for appellant.

*Debra S. Peterson*, assistant district attorney, argued the cause, and *Jeffrey V. Rowe*, assistant district attorney, *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, were with her on the briefs for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Marcus Clemons was convicted after a bench trial of premeditated first-degree murder, attempted first-degree murder, and criminal possession of a firearm. He was sentenced to life imprisonment with the possibility of parole in 25 years pursuant to K.S.A. 1998 Supp. 22-3717 on the premeditated first-degree murder conviction; 732 months on the attempted murder conviction, to run consecutively; and 8 months on the firearm conviction, to run concurrent with the 732-month sentence. He appeals his convictions and the 732-month sentence.

On appeal, Clemons challenges the sufficiency of the evidence of premeditation, the effectiveness of his waiver of a jury trial, the trial court's refusal to continue the trial, the trial court's failure to make a record of closing arguments, and the trial court's imposition of the 732-month sentence. He also claims the trial court violated his right to counsel.

During the morning of June 29, 1999, Marcus Clemons and Tony Davis set out to walk the short distance to a smoke shop, which is located in a small strip mall at the intersection of 9th and Grove streets in Wichita. As he and Davis were walking on the east side of Grove, defendant saw Satin Huffman and Arthur McPherson come out of a house on the west side of the street and begin

walking in the same direction as Clemons and Davis. Huffman and McPherson were also going to the smoke shop. Defendant testified that Huffman and McPherson were talking about him and Davis, gesturing toward them and laughing. Huffman testified that they were shouting back and forth across the street.

Defendant and Huffman had known each other since second or third grade, and they had a history of friction. Defendant said that he had been a skinny kid and that Huffman had always been a big guy. Huffman had bullied defendant. Sometimes Huffman and McPherson acted together in bullying defendant, and one time McPherson spit on defendant.

Defendant testified that Huffman and McPherson crossed the street and walked behind defendant and Davis. As they reached the parking lot, Huffman said he would beat defendant and defendant said he would not.

Accounts of what happened after all four young men reached the parking lot vary. In general outline but not necessarily in this order, some or all of the men went into the smoke shop, McPherson took off his shirt, defendant pulled his gun from his back pocket, and defendant fired four shots, hitting Huffman twice and McPherson twice. Huffman fell injured in the parking lot. McPherson fell across the street. McPherson died as a result of injuries caused by a bullet that entered his back slightly above the level of his elbow and just left of the midline.

Eddie Mills testified that he was walking by a parking lot near 9th and Grove when he saw three young men there arguing. He heard some shots and saw one of the men fall to the ground. He ran to the liquor store to notify police. He looked back and saw two men running across the street. One man was in front of the other, and Mills thought the one in front was being chased by the other man. Mills heard what sounded like two gunshots, and one of the running men fell. When Mills came out of the liquor store, there was a skinny fellow standing by the fallen man across the street. He thought that a couple of minutes elapsed between the first and second sets of gunshots.

When police officers arrived, Mills told one of them that he had seen four men standing in the parking lot yelling at each other. He

also told police that after he first heard shots and one man fell in the parking lot, he saw two men running across Grove. One fired a handgun and the other fell down on the sidewalk on the west side of the street. The shooter continued running.

Police found one man on the ground in the parking lot in front of the liquor store and another man on the ground on the other side of the street. The man on the other side of the street was Arthur McPherson, who was pronounced dead at the hospital. He was wearing pants but no shirt.

Valincia Jones, who owned the liquor store next door to the smoke shop, testified that she knew Satin Huffman. She looked out from the liquor store and saw Huffman and a man she did not know going to the smoke shop. She saw the stranger wave his hands, take off his shirt, and place it on her car. When she heard gunfire, she dropped to the floor. A man came into the store and said to call police. She called the police. When she went outside, she saw Huffman lying in front of the barber shop. The shirtless man was across the street and to the south. Jones testified that she was uncertain about the number of shots, but thought there may have been five. She thought they were all together rather than in two sets.

Felicia Ballance was driving by the parking lot and pulled in to talk to Tony Davis. There were four people in the parking lot. She heard gunshots, and saw Huffman fall. Ballance testified that Huffman and the gunman were close enough to touch each other when Huffman was shot. The gunman got a silver gun with a brown handle from his belt, in the front. He chased McPherson across the street. Ballance testified that she saw no weapons on Huffman or McPherson and that Davis was holding a soda. She heard four gunshots that were all together, and then she heard another gunshot "around the corner."

Tony Davis did not remember seeing Felicia Ballance at the scene of the shooting. Davis testified that he and defendant walked to the smoke shop, and they saw Huffman and McPherson. Words were exchanged, mostly between Huffman and Clemons. McPherson said he wanted to fight, and he took off his shirt. Davis, Huffman, and McPherson went into the smoke shop without the

defendant. After they came out, McPherson asked Huffman to pass him a gun. Huffman said no. Davis did not see either Huffman or McPherson with a weapon. Then defendant shot Huffman with a gun that Davis thought defendant pulled from his back pocket. Davis testified that he was standing between Huffman and McPherson when Clemons shot Huffman. McPherson ran, and defendant shot him. Davis did not think that defendant ran after McPherson. Davis ran away.

Davis had a gun, but he did not fire it. A gun later retrieved by police from Davis' bedroom in his grandmother's house was not the gun that fired the bullets retrieved from McPherson's body.

Huffman testified that he and Clemons had known each other since second or third grade and that they had a history of "[a]rguments and stuff like that." Huffman said that the men had been yelling back and forth across the street as they walked to the smoke shop and that, before going into the smoke shop, they were talking about a fistfight. Huffman testified that he and McPherson went into the smoke shop, but Davis and Clemons stayed outside. While in the shop, he noticed that McPherson had gone back outside. As Huffman stepped out of the smoke shop, he saw McPherson taking off his shirt. After he got outside, approximately 3 to 4 feet outside the smoke shop, he felt dizzy and numb. He fell down. He saw some people walking toward McPherson. He did not realize until told at the hospital that he had been shot on the left side of his head behind his ear and in the left hip.

A photograph introduced by the State showed that there were four shops in a little strip mall. Closest to the corner was the smoke shop, then the liquor store, a barber shop, and a candy store. Defendant also was shown a photograph that had been marked to show where blood was found on the parking lot, and he agreed that was where the argument took place. Based on the photographs, defendant agreed that the shooting took place right in front of the barber shop.

Clemons testified that as he and Davis walked to the smoke shop, Huffman walked behind with McPherson and made remarks about beating up Clemons. Clemons and Huffman had known each other a long time. Clemons was a skinny kid; Huffman was a big one.

Clemons was bullied by Huffman. Sometimes McPherson had joined Huffman in bullying Clemons, and one time McPherson spit on defendant. Defendant said that he was not going to back down anymore.

Clemons testified that all four men went into the smoke shop, where they continued to argue and McPherson took off his shirt. Defendant was the first to leave the shop. McPherson came out immediately and got in front of Clemons. McPherson's taking off his shirt indicated to Clemons that the fight was not going to be just him and Huffman.

When Huffman came out of the store, he was in front of defendant. McPherson was to defendant's left. Defendant testified that he thought they were going to jump him. He considered running but thought he might get caught. Defendant did not know where Davis was and thought he had gone. Defendant was scared. Huffman and McPherson were bigger than him. As defendant was "kinda backing up," he heard McPherson say, "[P]ass me that 9." He believed McPherson was asking Huffman to give him a 9 mm gun.

Clemons testified, "I just really . . . got scared, 'cause I knew . . . they was gonna shoot me with the gun." He added, "I thought I was gonna die right there." Clemons testified that he thought Huffman was reaching for a gun when Huffman "just kinda moved his arm like he was going for his hip." Defendant thought, "[I]t's gonna either be him or me," reached for his gun, and fired at Huffman. He fired four times and then ran away. He denied firing the gun after he was running and denied chasing McPherson. Defendant said that he fired the four shots in quick succession, with no breaks between shots. He testified that he shot McPherson before McPherson reached the curb on the near side of the street.

Clemons did not see either Huffman or McPherson with a weapon. He conceded that when he extended his arm to shoot, the gun was approximately a foot from his victims. Clemons also conceded that he shot McPherson in the back.

The trial court took judicial notice that in November 1995 Clemons had been adjudicated as a juvenile offender on a charge of aggravated robbery.

At the conclusion of evidence, the trial court judge announced that he found defendant guilty of premeditated first-degree murder of Arthur McPherson, guilty of attempted first-degree murder of Satin Huffman, and guilty of criminal possession of a firearm.

Clemons contends that the evidence was insufficient to show premeditation, which was an element of the murder and attempted murder counts. When the sufficiency of the evidence is challenged in an appeal from criminal convictions, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the court is convinced a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. *State v. Jasper*, 269 Kan. 649, 655, 8 P.3d 708 (2000). Defendant contends that it was happenstance that he went to the smoke shop at the same time Huffman and McPherson went there. He further contends that he did not think about shooting either Huffman or McPherson before he did shoot them and that he used his gun in response to the threat he perceived from Huffman and McPherson.

There is no evidence that it was anything but coincidence that the young men all went to the smoke shop at the same time. Clemons testified that he carried a gun for protection because he lived in an area where people get hurt all the time. All the evidence of the conduct of Huffman, McPherson, and Clemons while walking to the smoke shop shows them arguing. Defendant testified that Huffman was taunting him.

The evidence relative to the shootings is mixed. Clemons testified that the arguing continued while the four men were in the smoke shop and after they came out into the parking lot. He believed he was in mortal danger because he thought he heard McPherson ask Huffman for a gun. Tony Davis stated that he heard McPherson ask for a gun. When Huffman moved his arm, according to Clemons, he shot him twice from approximately a foot away. Bullets struck Huffman behind his left ear and in his left hip. Clemons admitted that he then shot twice at McPherson's back. Bullets struck McPherson in his left back and the back of his left arm.

Huffman testified that as soon as he stepped out of the smoke shop, he felt numb and dizzy and fell to the ground.

Clemons testified that he fired all the shots in quick succession. Mills heard two sets of gunshots, perhaps several minutes apart. Jones heard only one set of gunshots; she thought there may have been five shots. Ballance heard four gunshots all together and then a fifth shot around the corner.

Clemons denied chasing McPherson. However, Mills saw two men running across Grove Street. One fired a handgun, the other fell down on the sidewalk on the west side of the street, and the shooter continued running. Ballance testified that Clemons chased McPherson across the street.

Viewed in the light most favorable to the State, we conclude that a rational factfinder could find beyond a reasonable doubt that Clemons killed McPherson with premeditation.

With regard to Clemons' shooting of Huffman, Huffman testified that Clemons gunned him down as soon as Huffman stepped out of the smoke shop, but less subjective State's evidence placed the shooting in the parking lot in front of the barber shop or the liquor store. The men were arguing. Clemons and Davis thought they heard McPherson ask Huffman for a gun. When Clemons thought he saw Huffman reaching for a gun, Clemons pulled his gun and shot Huffman.

The evidence of premeditation in a first-degree murder case need not be direct and often is established by circumstantial evidence. A conviction of even the gravest offense may be sustained by circumstantial evidence. Premeditation cannot be inferred from the use of a deadly weapon alone; it may be inferred where other circumstances also exist. *State v. Murillo*, 269 Kan. 281, Syl. ¶ 2, 7 P.3d 264 (2000). A factfinder likely would consider Clemons' remaining outside the smoke shop while Huffman and McPherson went inside to be a telling circumstance. Clemons testified that it was not unusual for people in that area to be armed; thus, he might have suspected that Huffman and McPherson were armed. He had the opportunity to leave and avoid further conflict, but he did not. Other circumstances the court has identified that may give rise to the inference of premeditation include: (1) the nature of the weapon used; (2) lack of provocation; (3) the defendant's conduct before and after the killing; (4) threats and declarations of the de-

fendant before and during the occurrence; and (5) the dealing of lethal blows after the deceased was felled and rendered helpless. The jury has a right to infer premeditation from the established circumstances if the inference is a reasonable one. *Murillo*, 269 Kan. 281, Syl. ¶ 2. In this case, Clemons used a handgun when he thought a gun was being pulled on him. Before the shooting, there was general arguing and taunting. No threats or declarations by Clemons were reported. He shot Huffman first and then fled from the scene after chasing and shooting McPherson. Although a closer call than the killing of McPherson, viewed in a light most favorable to the prosecution, a rational factfinder could have found the defendant guilty of attempted first-degree murder of Huffman.

In the present case, defendant's waiving a jury trial was connected to his attempting to represent himself. The occasion on which Clemons complains he was not represented and should have been was when he waived his right to jury trial on August 7, 2000. Clemons told the trial court on July 14, 2000, that he did not think that his appointed counsel, Kenneth Clark, was properly preparing his case. Defendant wanted a different attorney, or he wanted to represent himself. Clark was the third attorney to represent Clemons in this case. The trial court did not believe that the grounds presented by defendant were sufficient for a change of attorney. On July 21, 2000, defendant told the trial court that he wanted to represent himself. The trial court advised defendant of the hazards of self-representation. Defendant reaffirmed that he wanted to represent himself. The court agreed, and Clark became standby counsel.

On August 7, 2000, the day trial was scheduled to begin, Clark advised the trial court that Clemons wished to waive a jury trial. Clemons affirmed that he wanted to waive jury trial. The trial court inquired of the defendant: "You understand that, if you give up the right to a jury, you won't be allowed to change your mind and have a jury at some future time." Defendant answered, "Yes." The prosecuting attorney said that he would be ready to present evidence the following morning. Clark inquired of the defendant: "If they're ready to proceed immediately, do you still wanna waive a jury?" Clemons replied: "Nah, I need some time. I ain't ready." The trial

court asked the defendant, "Is that why you wanna waive jury, is to have some time to get ready?" This exchange followed:

"THE DEFENDANT: I'm—yeah. I'm just not ready.

"THE COURT: Okay. All right. Do you wish to continue to represent yourself, or you wanna have Mr. Clark get ready to represent you in your trial?

"THE DEFENDANT: I'm trying to get some kind of counsel. I can't represent myself.

"THE COURT: Well, I know you've been through that long, long and lengthy session with Judge Owens. But you understand, if you give up your right to a jury trial this afternoon, you will not be allowed to change your mind and have a jury trial when you think you're ready or when the three weeks is up and put it back on the jury trial docket. I'll just guarantee you that's not gonna happen. You understand that, sir?

"THE DEFENDANT: Yes.

"THE COURT: Okay. All right. Is it your decision to give up your right to a jury trial?

"THE DEFENDANT: Yes.

"THE COURT: You've discussed it with Mr. Clark.

"THE DEFENDANT: Yes.

"THE COURT: Okay. And no one—has anyone made you any promises to get you to give up your right to a jury trial?

"THE DEFENDANT: No.

"THE COURT: They threatened you with anything?

"THE DEFENDANT: No.

"THE COURT: Okay. I'll accept the waiver of jury trial. Case will be taken off the court's jury trial docket. Be set for bench trial. Three weeks."

When the parties next appeared before the trial court on August 29, 2000, defendant announced that he was not going to represent himself. Kenneth Clark told the trial court that defendant had informed him the day before that defendant wanted Clark to represent him. Clark requested a continuance in order to complete preparation of the defense. The trial court denied the request for continuance, and trial proceedings began.

On September 27, 2000, the parties appeared before the trial court on defendant's motion for new trial and sentencing. The principal ground for new trial was defense counsel's inadequate time for trial preparation. Clark also mentioned defendant's waiver of jury trial. Clark's comments on the waiver were, in full:

"Mr. Clemons had also made the decision to waive a jury trial, which I don't believe was in his best interests.

"I don't really think he fully understood the potential consequences and the significance of the decision he made to represent himself and the nature of the trial that was undertaken."

The motion for new trial was overruled.

On appeal, Clemons contends that he did not knowingly or voluntarily waive his right to a jury trial. In the trial court, defendant never sought to withdraw his waiver, but he complained about the waiver of jury trial in the motion for new trial. The motion centered on defendant's attempted self-representation, but the jury waiver issue was given as an additional reason for new trial. The mention of jury waiver in the motion for new trial is quoted in the preceding paragraph.

The State relies on *State v. Luna*, 271 Kan. 573, Syl. ¶ 2, 24 P.3d 125 (2001), in arguing that the issue is not properly before the court. In that case, defendant asserted that he did not knowingly or voluntarily waive his constitutional right to a jury trial. In concluding that the issue was not properly before the appellate courts, this court stated that in the trial court, defendant never sought to withdraw his waiver or made any complaint about it and in his docketing statement, defendant did not include jury waiver as an issue. The court in *Luna* stated: "Where constitutional grounds are asserted for the first time on appeal, they are not properly before the appellate court for review, and the exceptions to that rule do not apply in this case. See *State v. Mason*, 268 Kan. 37, 39, 986 P.2d 387 (1999)." 271 Kan. at 577. The circumstances in this case differ from those in *Luna* in that defense counsel brought the jury waiver issue to the trial court's attention in arguing defendant's motion for new trial.

On appeal, Clemons argues that his waiver was ineffective because he was not properly advised by the trial court of his right to a criminal trial. We discussed the test for determining the validity of a jury trial waiver in *State v. Irving*, 216 Kan. 588, 589, 533 P.2d 1225 (1975), see *Johnson v. State*, 271 Kan. 534, 535, 24 P.3d 92 (2001). In *Irving*, the court held that "in order for a criminal defendant to effectively waive his right to a trial by jury, the defendant must first be advised by the court of his right to a jury trial, and he must personally waive this right in writing or in open court for

the record." 216 Kan. at 590. In the present case, the defendant personally waived his right on the record.

The question is whether he had been advised of his right to a jury trial before he waived the right. The trial court used the phrases "right to a jury" and "right to a jury trial" several times when discussing waiver with the defendant. The trial court, however, did not tell defendant that he had a right to a jury trial.

In *Johnson*, 271 Kan. at 534, the defendant was questioned on the record by his attorney to make sure Johnson understood what he would be giving up and was asked in part:

" 'Q: Now, you understand that you have a right to go before 12 people to have your case tried?
'A: Yes, I do.

. . . .

'Q: Now, it is my understanding that you are willing to give up your right to a jury trial; is that right?
'A: That's right.
'Q: That means that you would not be tried by 12 people but would be tried by one person.' "

The court determined that Johnson was informed of the rights he was waiving. 271 Kan. at 534.

In *State v. Stuber*, 27 Kan. App. 2d 160, 1 P.3d 333, *rev. denied* 269 Kan. 940, *cert. denied* 531 U.S. 945 (2000), the principal issue with regard to jury trial waiver was whether the trial court coerced defendant into waiving jury trial by threatening to deny an appeal bond if he was convicted by a jury. The Court of Appeals found no indication of the alleged coercion in the record. The Court of Appeals determined that the defendant voluntarily waived his right to a jury trial with an understanding of what he was giving up. The determination was based on the following colloquy during the jury trial waiver hearing:

" 'THE COURT: Your attorney indicates that you're willing to waive your right to a jury trial in this case. What that means is that if this case goes to trial, it will be tried before a judge and you will be giving up your right to have this case tried before a jury of 12 persons; is that what you wish to do?
'MR. STUBER: Yes, I understand that, Your Honor, and that's, I guess, what I wish to do, yes.' " 27 Kan. App. 2d at 164.

In *Johnson* and *Stuber*, each defendant was advised that he had a right to have the charges against him tried before a jury of 12 people and that if he waived jury trial he would be tried by a judge. In the present case, in contrast, defendant was not advised that he had a right to have the charges against him tried before a jury of 12 people and that if he waived jury trial he would be tried by a judge.

Clemons further argues that the most egregious failing was the trial judge's failing to advise him that a jury's verdict would have to be unanimous. He cites no Kansas case in support of his argument.

Clemons cites *Irving* for the statement that whether the test for determining the validity of a waiver of the right to jury trial is satisfied in any given case will depend on the particular facts and circumstances of that case. See 216 Kan. at 589. He argues that the waiver is not valid in the particular circumstances of this case. Clemons specifies the following factors, in addition to the failure to advise him what he was giving up: Clemons was 20 years old at the time of the waiver (born 7-11-80; waiver 8-7-00). He was representing himself. Standby counsel did not get involved in the waiver discussion except to ask defendant, "If they're ready to proceed immediately, do you still wanna waive a jury?"

The right to a jury trial may be waived, but waiver must be knowingly and voluntarily made. That determination is not made in a vacuum but must be based upon the facts and circumstances in each case. Here, Clemons created the situation of which he now complains. Clemons could not give a valid reason for the court to appoint a fourth attorney to represent him in this case. When the court refused to appoint another attorney, he chose to represent himself. However, Clark remained his counsel and was available on a standby basis. Although Clark was not present when Clemons waived jury trial, Clemons indicated to the court that he had discussed the waiver with his counsel. In fact, it was Clark who advised the judge that Clemons wished to waive jury trial. The waiver was made the day of trial with the jury venire present in the courtroom. Clemons did not complain or seek withdrawal of his waiver during the trial, nor did he ever express ignorance as to his right to jury

trial. We conclude under the totality of the circumstances that Clemons knowingly and voluntarily waived his right to a jury trial.

The trial court followed the procedure described in *State v. Lowe*, 18 Kan. App. 2d 72, 76-77, 847 P.2d 1334 (1993), for responding to a defendant's assertion of a right to self-representation in a criminal case. The trial court informed Clemons "that at any time you can change your mind and retain counsel to represent or Petition the Court for appointment of counsel to represent you, which would be the one you have already got."

As previously noted, on the day of the jury trial Clemons informed the trial court that he wanted to waive the right to a jury trial. The trial judge asked whether Clemons wished to continue representing himself or wanted Clark to prepare to represent him at trial. Defendant replied, "I'm trying to get some kind of counsel. I can't represent myself." Instead of pursuing the issue of representation with Clemons when he said that he could not represent himself, the trial judge warned him that if he waived his right to jury trial at that time he would not be allowed to change his mind. After asking Clemons a few more questions, the trial judge accepted defendant's waiver of the right to jury trial.

On appeal, defendant contends that when he stated, "I can't represent myself," the trial judge was required to inquire whether defendant wished to have Clark reappointed before proceeding with defendant's waiver of his right to a jury trial. According to Clemons, by failing to re-inquire whether he wished to have counsel reappointed, the trial judge deprived him of his right to counsel. Proceeding with the waiver of the right to a jury trial without inquiring about reappointment of counsel, Clemons contends, compounded the error and resulted in his being deprived of a second fundamental right.

He cites *Chapman v. United States*, 553 F.2d 886, 893 (5th Cir. 1977), for the proposition that a criminal defendant may waive his or her right to *self*-representation by vacillating on the issue. He does not argue, however, that he waived his right to represent himself when he said he could not represent himself. Rather, he argues that the trial court was required to ask again whether he wanted to. have standby counsel reappointed. Clemons cites no

authority for the asserted principle. We note that Clark continued as standby counsel, and Clemons informed the court that he had discussed the waiver of jury trial with Clark. We find no merit in Clemons' argument.

Clemons next argues that the trial court abused its discretion by denying a continuance of the trial, because the denial prevented presentation of a full and complete defense. He asserts generally that witnesses were not fully interviewed or properly subpoenaed and the State's evidence was not adequately examined. He offers no more specific information, however, about what defense counsel would or could have done differently if a continuance had been granted.

The State points out that Clark was not completely unprepared when he was asked by defendant on the day before trial to take over representation. The certified copy of the appearance docket that appears in the record on appeal shows that Clark was initially appointed on or about April 24, 2000. On July 14, 2000, Clark was asked by the trial court if he thought he would be ready to try the case on August 7. Clark said, "I believe so. I'm not certain at this point." The trial court asked: "Is there any problem that you have had in preparing this case for trial? . . . . Do you feel as though you need to talk with him more frequently to assist you in preparing for trial?" Clark answered, "Not at this point, Your Honor." He further reported that he had been able to get the information he needed for defendant to help him interview witnesses and prepare the defense. A week later, on July 21, 2000, the trial court conducted a hearing for the purpose of finding whether the defendant had made a knowing and intelligent waiver of counsel. Toward the end of the hearing, Clark asked the trial court for clarification of his obligations as standby counsel. He was told to "be available so that the trial Judge can pick up the phone and call you, you can come over and jump in."

The State also points out that defendant was granted a 3-week continuance when he waived his right to a jury trial on the day his jury trial was scheduled to begin.

Again, much of what Clemons complains is a result of his own action. We find no abuse of discretion in these circumstances.

Clemons contends that the 732-month sentence for attempted first-degree murder violates the prohibition of cruel and unusual punishment. Clemons was sentenced to life imprisonment for the first-degree murder of McPherson and to 732 months imprisonment for the attempted first-degree murder of Huffman. The sentences are to run consecutively.

Clemons argues on appeal that the attempted murder sentence is disproportionate to the murder sentence and, thus, constitutes the infliction of cruel and unusual punishment. See *State v. Freeman*, 223 Kan. 362, 367, 574 P.2d 950 (1978). His argument is not that 732 months is longer than life. Rather, his argument is that the amount of time he actually will serve in prison for his 732-month sentence will be longer than the amount of time he will serve in prison for his life sentence. At best, the 732 months may be reduced by 15% for good time, K.S.A. 2001 Supp. 21-4722(a)(2), thus reducing 61 years to just under 52 years. (732 months is 61 years; 732 months reduced by 15% is 622.2 months, which is 51.85 years.) On the life sentence, defendant is eligible for parole after 25 years.

The State argues two grounds on which defendant's constitutional challenge to his attempted murder sentence is not properly before this court. First, the Court of Appeals has stated that constitutional challenges to a presumptive guidelines sentence are not cognizable on direct appeal. *State v. Lewis*, 27 Kan. App. 2d 134, 140-42, 998 P.2d 1141, *rev. denied* 269 Kan. 938 (2000). Second, constitutional issues raised for the first time on appeal are not properly before the reviewing court. *State v. Mason*, 268 Kan. 37, 39, 986 P.2d 387 (1999).

In *Lewis*, the Court of Appeals noted that K.S.A. 21-4721(c)(1) provides: "On appeal from a judgment or conviction entered for a felony committed on or after July 1, 1993, the appellate court shall not review . . . [a]ny sentence that is within the presumptive sentence for the crime." 27 Kan. App. 2d at 140. The Court of Appeals further concluded that the statutory prohibition of direct appeal controlled where the defendant's claim was that the presumptive guidelines sentence imposed on him constituted cruel and unusual punishment in violation of the Eighth Amendment's cruel and un-

usual punishment clause. 27 Kan. App. 2d at 140-42. The right to appeal is entirely statutory, and pursuant to K.S.A. 21-4721(c)(1), we have no jurisdiction to hear Clemons' appeal on this issue. "When the record discloses a lack of jurisdiction, it is the duty of this court to dismiss the appeal." *State v. Medina*, 256 Kan. 695, Syl. ¶ 2, 887 P.2d 105 (1994).

Clemons' final challenge is based on the trial court's failure to have a record made of closing arguments. At the direction of the trial judge, summation was off the record. Defense counsel made no objection. On appeal, Clemons argues that he was deprived of due process and equal protection because no record of summations was made, thus precluding full review by appellate counsel and this court of the trial proceedings. He does not allege that there was anything improper in summations so that the absence of a record of summations makes it impossible to present the impropriety to the reviewing court. Instead, he argues that the absence of a record of summations is the error.

In all but one of the Kansas cases Clemons cites, the defendants were tried to a jury. The one bench trial case Clemons cites is *State v. Gordon*, 219 Kan. 643, Syl. ¶ 11, 549 P.2d 886 (1976), which he cites for the proposition that "[w]here trial is by the district court, on appellate review the supreme court indulges in the presumption the lower court considered only properly admissible evidence in reaching its decision unless the contrary is shown by the record." He concedes that closing arguments are not evidence and that, in a bench trial, the trial court is presumed to possess and apply the ability to filter improper submissions from consideration.

In *State v. Stafford*, 223 Kan. 62, Syl. ¶ 1, 573 P.2d 970 (1977), the court stated:

"The inability of the state to provide a full transcript of the trial proceedings does not entitle a defendant to a new trial per se. Before defendant can claim he is entitled to a new trial he must demonstrate that despite a good faith effort it is impossible to reconstruct the missing portion of the record and this precludes effective appellate review of the issues."

Clemons has demonstrated no prejudice as a result of summations not being recorded. Moreover, without a contemporaneous objec-

tion, the issue was not properly preserved for appellate review. See *State v. Zabrinas*, 271 Kan. 422, 433, 24 P.3d 77 (2001.)

At oral argument, counsel for Clemons requested and was granted permission to file a supplemental brief addressing whether juvenile adjudications may be included in the criminal history score. Clemons argues that the use of such adjudications is unconstitutional under the ruling in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). We decided that issue in our recent decision in *State v. Hitt*, 273 Kan. 224, 42 P.3d 732 (2002). In *Hitt*, we said:

> "*Apprendi* created an exception allowing the use of a prior conviction to increase a defendant's sentence, based on the historical role of recidivism in the sentencing decision and on the procedural safeguards attached to a prior conviction. Juvenile adjudications are included within the historical cloak of recidivism and enjoy ample procedural safeguards; therefore, the *Apprendi* exception for prior convictions encompasses juvenile adjudications. Juvenile adjudications need not be charged in an indictment or proven to a jury beyond a reasonable doubt before they can be used in calculating a defendant's criminal history score under the KSGA."

Thus, Clemons' final argument also fails. We affirm the judgment of the district court.

DAVIS, J., not participating.
BRAZIL, S.J., assigned.