No. 100,719

STATE OF KANSAS, *Appellee*, v. ANTHONY BARNES, *Appellant*.

(262 P.3d 297)

Opinion filed September 23, 2011.

*Michelle A. Davis*, of Kansas Appellate Defender Office, argued the cause, and *Heather Cessna*, of Kansas Appellate Defender Office, was on the brief for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Nola Tedesco Foulston*, district attorney, and *Steve Six*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: Defendant Anthony Ray Barnes appeals his convictions on one charge of first-degree premeditated murder and one charge of aggravated assault. He was sentenced to life in prison with the possibility of parole in 25 years for the murder, with a consecutive 14 months for the aggravated assault.

Barnes raises five issues:

(1) Whether the district judge erred by failing to investigate Barnes' competency to stand trial rather than accepting his waiver of jury trial;

(2) Whether Barnes' waiver of his right to jury trial was knowing and voluntary;

(3) Whether there was sufficient evidence to support Barnes' possession of the requisite mental state for first-degree premeditated murder and aggravated assault;

(4) Whether the district judge erred by relying on Barnes' criminal history score to impose sentence, when Barnes' criminal record had not been proved to a jury; and

(5) Whether the district judge erred in sentencing Barnes to the high number in the range assigned to the presumptive grid box for the aggravated assault.

## FACTUAL AND PROCEDURAL BACKGROUND

Jacklyn Wesley, the wife of Barnes' nephew, gave Barnes a ride to his ex-wife's home in Wichita. Wesley remained in the car while Barnes went up to the door and had a conversation with a young woman. Barnes then asked Wesley to take him to a QuikTrip at the corner of Murdock and Broadway. When Barnes left Wesley's vehicle there, he told her to tell his sister, Regina Billingsly, with whom he lived, that he would not be coming home.

Barnes stood near pay phones outside the QuikTrip, smoking a cigarette. A customer, Prentiss Cherry, went into the QuikTrip to buy a soda. As Cherry paid for the soda, he joked with the QuikTrip clerk, Brian Hall. As Cherry left the store and walked toward his car, Barnes walked up to him with a gun and told him to stop laughing. Cherry backed away from Barnes and fled toward the gas pumps. Barnes did not follow Cherry; instead, he walked into

the store. Once inside, Barnes walked up to the counter, raised his gun, and shot Hall in the head. Barnes then left the store and resumed standing by the pay phones, smoking another cigarette. Hall died from his head wound.

Shortly after the shooting, police arrived on the scene. Police Chief Norman Williams first engaged with Barnes, telling him to drop his gun. Barnes did not immediately drop his gun, instead finishing his cigarette and indicating to the surrounding police that he would shoot one of them. According to one officer, Barnes also said something about the police not helping him with the situation with his kids. Another officer testified that Barnes said the police did not understand about grief and did not care about his kids. After Barnes finished his cigarette, he placed his gun on a nearby curb and turned around to put his hands on the exterior wall of the store.

After his arrest, Barnes waived his *Miranda* rights and confessed to shooting Hall and menacing Cherry. The State charged Barnes with one count of first-degree premeditated murder and one count of aggravated assault.

Before trial, Barnes filed a motion for a competency evaluation. ComCare evaluated Barnes and, while recognizing he had diagnoses of paranoid schizophrenia and intermittent explosive disorder, concluded that, with adequate medication, he was competent to stand trial. Barnes did not object to ComCare's report or provide any additional information for the district judge's review at the subsequent hearing, and the district judge found him competent to stand trial.

Shortly thereafter, Barnes notified the court and the district attorney's office of his intention to pursue a mental disease or defect defense under K.S.A. 22-3219.

At trial, the State presented evidence from multiple witnesses present at the QuikTrip on the day of the shooting.

Wesley testified that Barnes was not behaving in a strange way when she gave him a ride to his ex-wife's home and then to the QuikTrip.

Cherry testified that, as he was walking out of the QuikTrip, Barnes walked up to him with a gun and said, "Stop laughing." As

Cherry ran from Barnes toward the gas pumps, Barnes said, "fuck it," and turned to go into the store. Barnes walked up to the counter and shot the clerk one time.

Felicia Redmon, who was walking out of the QuikTrip a few paces behind Cherry, testified that Barnes walked up to Cherry with a gun in his hand, saying something along the lines of "keep talking." She also testified that she saw Barnes walk into the store and raise the gun over the counter. She also heard a gunshot.

Donnie Coleman testified that, before he could walk into the QuikTrip, a man warned him not to go inside because there had been a shooting. Coleman did not believe the man and went inside the store. He saw Hall lying on the ground. After he walked out of the store, a different man in a blue hooded sweatshirt approached him from the pay phone area and asked him, "Do you want one too?"

Cheryl Donelan, a nurse who stopped at the QuikTrip immediately after the shooting, had started to walk into the store when a woman urged her to help because someone had been shot. Donelan testified that she turned to Barnes, who was standing by the pay phones and asked: "Is she kidding?" Barnes replied: "No, go on in, he's been shot."

Sergeant Michael McGee and Officer Jon Estrada were among the police officers who responded to the QuikTrip after the shooting. McGee testified that Barnes was wearing a blue hooded sweatshirt. Both McGee and Estrada understood Barnes to indicate, verbally and nonverbally, that, after he finished smoking his cigarette, he intended to shoot one of the officers who had responded to the scene. However, when Barnes finished smoking, he instead laid his gun down. Several other eyewitnesses, including Williams, McGee, Estrada, and Officer Matthew Lowe, confirmed that, after Barnes finished his cigarette, he responded to police instructions to drop his gun and put his hands against the exterior wall of the store.

Detective Rick Craig interviewed Barnes after he was arrested. Craig testified that Barnes responded calmly to his questions and did not complain about hearing voices. Barnes confessed that he had shot someone at QuikTrip but did not know the victim's name.

He described what happened, stating Cherry had come out of the store and said something under his breath. Barnes thought Cherry and Hall were laughing at him and was upset by it. He said that he intended to shoot Cherry, but, when Cherry saw him coming up to him with the gun, he decided to shoot Hall instead. Barnes initially said he did not know why he shot Hall; but, later in the interview, he said he had shot Hall because Hall was laughing with Cherry. Barnes did not say that he shot Hall because he was hearing voices. He said that his original intention was to shoot himself and he would have done so, but then he saw Cherry and Hall laughing. He also said he wished he had shot at the police because they then would have shot him.

Barnes' evidence at trial was designed to support his theory that, because of his paranoid schizophrenia, he was unable to form the requisite intent for each of the charged offenses. His ex-wife testified that, after a car accident many years ago, Barnes had become increasingly withdrawn and angry, believing people were after him and making fun of him. Andy Meyer of ComCare testified that the suicide hotline at ComCare received several bizarre calls from Barnes a few months before the shooting.

After 2 days of testimony before the jury, Barnes' attorney told the district judge that Barnes wanted to waive his right to jury trial and proceed with a bench trial. The district judge acknowledged Barnes' history of mental illness and stated that she wanted to ensure that Barnes understood his right to a jury trial. The judge then questioned Barnes on his understanding of his rights and the roles of the parties and the court:

"THE COURT: First of all, throughout the course of this trial, I noticed that you've sat there with your head down quite a bit. Have you been listening to the evidence?

"THE DEFENDANT: Yes.

"THE COURT: Okay. Good. Have you been listening and observing the evidence in this trial?

"THE DEFENDANT: Yes, I have.

"THE COURT: All right. Have you been understanding what is been going on?

"THE DEFENDANT: Sort of, kind of, yeah.

"THE COURT: I'm sorry?

"THE DEFENDANT: Sort of, kind of, yeah.

"THE COURT: Okay. Tell me about—Tell me about your right to have a jury trial. Tell me what you know about that.

"THE DEFENDANT: Um, what happens if you have a trial, jury trial? I don't know what the outcome is going to be.

"THE COURT: Who decides that?

"THE DEFENDANT: A judge. You do.

"THE COURT: A jury trial.

"THE DEFENDANT: Yes.

"THE COURT: In a jury trial, who decides if you're innocent or guilty?

"THE DEFENDANT: You do.

"THE COURT: When we have jury trial, that's when we have all those people sitting over there.

"THE DEFENDANT: The jury.

"THE COURT: The jury decides. My job would be to preside over the sentencing at that time, but I don't decide when you're guilty or innocent. Now, if we have a bench trial, if you give up your right to have a jury trial, then who would decide whether you're guilty or not?

"THE DEFENDANT: The jury.

"THE COURT: You get a verdict. I don't think you're listening to me. Let's start over again. Are you nervous?

"THE DEFENDANT: A little bit.

"THE COURT: Okay. Now, you can't be nervous here. So take a deep breath, because this is very important that I believe that you understand what's happening.

"THE DEFENDANT: All right.

"THE COURT: Let me ask: Who do you want to decide, the jury or me?

"THE DEFENDANT: You.

"THE COURT: All right. And why do you want me to decide?

"THE DEFENDANT: Because you're the judge.

"THE COURT: Well, that's true. I am the judge. But do you have concerns if it goes to a jury, if the jury decides?

"THE DEFENDANT: A little bit, yeah.

"THE COURT: Tell me about that.

"THE DEFENDANT: Well, they can decide if I'm where, and if I'm where and how long.

"THE COURT: That's what I decide.

"THE DEFENDANT: Okay.

"THE COURT: All right. Have you been able to talk to your lawyer this morning?

"THE DEFENDANT: Yes.

"THE COURT: And did you discuss whether or not you wanted me to decide, or whether or not you wanted a jury to decide.

"THE DEFENDANT: Yeah. He explained a little bit to me, he explained a little bit to me. And I just, um, um, just answered his questions.

. . . .

"THE COURT: . . . So here's the difference, Mr. Barnes. If we continue, like we've been going, the jury will listen to all the evidence. And then they'll make a decision whether you're guilty or whether you're not guilty. And if they find that you're not guilty, they'll decide whether that's because of your mental disease or defect. Okay?

"THE DEFENDANT: Uh-huh.

"THE COURT: Now, if you waive your right to have a jury trial, I would be the one deciding those things. Is that what you want to happen here today?

"THE DEFENDANT: Could you say that again?

"THE COURT: Do you want me to decide, or do you want the jury to decide?

"THE DEFENDANT: I mean, it doesn't really matter.

"THE COURT: It doesn't really matter?

"THE DEFENDANT: No.

"THE COURT: Well.

"THE DEFENDANT: I mean, it just, I mean, you can, um, if, I mean, I can just, I mean, I mean, you, I guess.

"THE COURT: You want me to?

"THE DEFENDANT: Yes.

"THE COURT: You don't sound very certain about that. You understand that I will consider all of the same evidence that the jury would have considered. You understand that?

"THE DEFENDANT: Yes.

"THE COURT: And do you understand that any finding that I make, you can't come back and say, I wish I had a jury instead of you. You understand, there is no turning back from this?

"THE DEFENDANT: I mean, if you—I mean, if you decide, I mean, how many years or whatever, I mean, I deserve that, so.

"THE COURT: Well, that's the sentence. We're talking about the trial.

. . . .

"MR. [Kevin] O'CONNOR[, prosecutor]: Judge, I suggest, at this point it's clear, at least to me, that Mr. Barnes is nervous. I know that [defense attorney Philip] White has spoken to him about this. I know that for a fact.

"THE COURT: I know that, as well.

"MR. O'CONNOR: I suggest we take a recess to give Mr. White another op-portunity to discuss Mr. Barnes' options at this point. Because I just, I think, I personally think he's just a little confused about this. A mental illness doesn't mean you can't make these decisions.

"THE COURT: That's why I'm making a record on this. Are you nervous?

"THE DEFENDANT: Yes, a little bit.

"THE COURT: Okay. Would it help you too a little bit to talk to your lawyer a little bit?

"THE DEFENDANT: I mean, I mean, I understand. I sort of, kind of under-stand. I mean, he doesn't need to talk to me any more.

"THE COURT: Well, I don't want you to kind of understand, I want you to understand.

"THE DEFENDANT: Okay.

"THE COURT: Do you understand?

"THE DEFENDANT: Yes.

"THE COURT: So when you say you sort of kind of understand, you're just saying you do. What you mean is you really do understand?

"THE DEFENDANT: I understand a little bit, yeah.

"THE COURT: So you understand that you can have either the jury make a finding whether you're guilty or not guilty, or I can make the finding. Who do you want to make the finding? Or who do you want to hear the rest of the evidence and make a decision about whether you're guilty or not guilty, me or the jury?

"THE DEFENDANT: I want to talk to my lawyer about that."

The judge then took a recess so that Barnes could speak with White.

Barnes and White had a discussion on the record outside the presence of the prosecutor, the judge, and the jury.

"MR. WHITE: . . . I want to see if you fully understand what we're doing. Now, you have a right to a trial by jury.

"THE DEFENDANT: Uh-huh.

"MR. WHITE: And at that jury trial, the jury decides your guilt or innocence. Do you understand that?

"THE DEFENDANT: Yes."

Barnes identified his attorney and stated that he understood he had a right to a trial by jury. He further stated that the prosecutors were there to present evidence against him, and Judge Rebecca Pilshaw was the judge. He stated that, during the trial, the judge was "[l]istening to all the evidence."

"MR. WHITE: Okay. Um, do you understand what the purpose of a trial is?

"THE DEFENDANT: Not entirely, no.

"MR. WHITE: What do you not understand?

"THE DEFENDANT: Um, I don't know. I'm not sure, you know.

"MR. WHITE: Are you nervous?

"THE DEFENDANT: I just, I mean, my brain's not working this morning.

"MR. WHITE: Okay. Um, I don't want to feed you information. I want to make sure that you understand what's going on. Okay?

"THE DEFENDANT: Okay.

"MR. WHITE: Tell me your understanding of why we have been here the last couple of days. What have we been doing?

"THE DEFENDANT: Taking me through a jury trial.

. . . .
"MR. WHITE: What does that mean to you?
"THE DEFENDANT: To have a jury decide if I'm guilty or innocent."

Barnes and White then discussed that White had filed a notice of intent to rely on mental disease or defect as a defense to the crimes. Barnes stated that his mental defect was paranoid schizophrenia. He said the jury also would decide whether he should go to a security hospital by reason of mental defect.

"MR. WHITE: . . . Do you remember, when we were picking the jury, did I ask each potential juror a question concerning whether each potential juror could decide if they could put you in the state security hospital?
"THE DEFENDANT: You asked them that.
"MR. WHITE: How many times did I ask that question?
"THE DEFENDANT: You asked it to every single one of them.
"MR. WHITE: I asked every single one of them. Did any of those potential jurors say no to that question?
"THE DEFENDANT: I think one or two said they couldn't decide what they would do because they hadn't listened to all the evidence.
"MR. WHITE: Okay. That's right. Where are you right now?
"THE DEFENDANT: Out in left field.
"MR. WHITE: You're out in left field. Um, can you tell me where you are physically located right now?
"THE DEFENDANT: In the judge's library.
"MR. WHITE: When you said, out in left field, was that a joke, or did you really mean that?
"THE DEFENDANT: It was a joke. That's a funny joke."

White and Barnes went on to discuss the roles of the people involved in the jury trial. Barnes stated that White's role was "to give me a fair trial." The prosecutors' function was to present evidence. In response to White's questions about the roles of the judge and the jury, Barnes stated that the judge's function was "[t]o listen to all the evidence, and enter a verdict of what she thinks about the case." The jury's function was

"[t]o decide and listen to all the evidence, and decide whether I'm guilty or not. Maybe the jury listens to all the evidence, um, figures if I'm guilty or not. And the judge is supposed to listen to all the evidence, and she makes her decision based on what the jury says."

He also said that, at sentencing, the judge

"tells me she heard all the evidence, and she gives me a decision on what she thinks about all the evidence. And she reads out a verdict of what that's going to be, how long, and where at . . . [w]here I'm going to spend the time and how long."

Immediately after this discussion, the judge, prosecutor O'Connor, and a second prosecutor joined the transcribed conversation in the judge's library.

"THE COURT: What is my job here in this trial?
"THE DEFENDANT: To listen to all the evidence, and, um, to decide if I'm guilty or innocent.
"THE COURT: All right. What does the jury do?
"THE DEFENDANT: The jury listens to all the evidence, and they decide where and how long.
"THE COURT: No. No. No. Okay. You're talking about sentencing."

The district judge questioned Barnes about the roles of the prosecutors and his attorney, and Barnes identified them. The judge then reviewed the two stages of a criminal trial—the guilt phase and sentencing.

"THE COURT: . . . What could happen if you were found guilty here? What could happen to you?
"THE DEFENDANT: I can spend a specified amount of years behind, in prison.
"THE COURT: All right. And what would happen if you were found not guilty by reason of mental disease or defect?
"THE DEFENDANT: I don't know.
"THE COURT: Okay. Okay. What happens if you're found not guilty, period.
"THE DEFENDANT: I guess I go home.
"THE COURT: Right. If you're found not guilty or mentally ill basically, where do you think you will go then?
"THE DEFENDANT: To Larned.
"THE COURT: Probably, okay.
"THE DEFENDANT: Mental hospital.
"THE COURT: So I think you actually do kind of understand what everybody does. I'm concerned, though, that you—because today, what we're talking about is waiving a jury trial—I'm concerned because I'm not sure you know the difference between the jury trial and a bench trial.
"THE DEFENDANT: I don't know the difference.
. . . .
"THE COURT: So what's the jury doing? What is the jury going to decide?
"THE DEFENDANT: They're going to decide if I'm guilty or not.

"THE COURT: If you say, I don't want a jury any more, I want a judge, who would decide then if you're guilty?

"THE DEFENDANT: Judge.

"THE COURT: And who do you want to decide whether you're guilty or innocent?

"THE DEFENDANT: It doesn't really matter.

"THE COURT: It doesn't matter. You have to make a pick, though, you have to decide.

"THE DEFENDANT: I know. I just, like, I mean, I'm guilty of the crimes, you know.

"THE COURT: And, well, and see, we saw the tape, we saw the disk, so we do know that. But, you know, you still have the right to trial. And here's the thing. The way it's happening now, they presented all of their evidence (indicating) to the jury. And, remember, at the beginning, when I told the jury that they decide guilty or innocence and I decide what law, what evidence they'll hear. Remember I said that?

. . . .

"THE DEFENDANT: Yes.

. . . .

"THE COURT: Well, now, if you give up your right to have a jury trial, then I would decide those things instead of the jury. Okay?

"THE DEFENDANT: (Nodding head up and down).

"THE COURT: Does that make sense to you?

"THE DEFENDANT: Yes.

"THE COURT: So you and Mr. White have been talking about whether I should decide, and whether you pick whether the jury to decide or whether I decide. So what that would mean is that we would let—if you decided to waive, or give up your right to have a jury trial, I would decide whether or not you're guilty. And I'd still hear the evidence. And I'd consider all the evidence I've already heard. And I would decide if you're guilty or not. Is that what you want to do? Mr. Barnes, you need to make a decision.

"THE DEFENDANT: Yeah, I mean.

"THE COURT: And I'm not trying to pressure you, and you're not in trouble. Either is good. Either thing is good. This morning Mr. White told me that what you wanted to do is, was to give up the jury and have me decide. Is that what you said to do?

"THE DEFENDANT: Yes."

The court permitted Barnes' counsel to question Barnes further on the record to ensure he was aware of what he was doing.

"MR. WHITE: Do you know what you're doing?

"THE DEFENDANT: Right now?

"MR. WHITE: Right now, what have we just been doing?

"THE DEFENDANT: Talking to me about, um, to either let the Judge or the jury decide what's going to happen to me.

"MR. WHITE: Right. That's correct. Your question is, is whether or not you want to have the jury decide, or to have a judge decide. Do you understand that?

"THE DEFENDANT: Yes.

"MR. WHITE: . . . Do you understand you have a right to have a jury trial to decide, the jury to decide. Do you understand that?

"THE DEFENDANT: Yes.

"MR. WHITE: Do you understand you also have the right to have a judge decide?

"THE DEFENDANT: Yes.

. . . .

"MR. WHITE: Who do you want to decide this case, the jury or the judge?

"THE DEFENDANT: Either of them.

"THE COURT: It can't be either of them. Who do you want to decide?

"THE DEFENDANT: You (indicating to Judge Pilshaw)."

White again reviewed the roles of defense counsel, the prosecutors, and the judge during trial, and Barnes correctly identified each participant. Then White asked:

"MR. WHITE: Who's this gentleman over here (indicating)?

"THE DEFENDANT: He's the guard.

"MR. WHITE: What's his job.

"THE DEFENDANT: To protect all of you from me.

(At this time, there was laughter in the library; thereafter continued the proceedings:)

"MR. WHITE: All right. Now, look, we're not going to do anything you don't want to do. Okay?

"THE DEFENDANT: Uh-huh.

"MR. WHITE: Do you understand that?

"THE DEFENDANT: Yes.

"MR. WHITE: We're going to do what you want to do.

"THE DEFENDANT: I don't know what I want to do.

"MR. WHITE: Hold on. Let me ask a question. Do you understand what the purpose of a trial is?

"THE DEFENDANT: I just want to get it over, out for what I did. That's all I want to do. It doesn't matter who decides, I mean, I'm guilty for what I did, and very sorry, so.

"MR. WHITE: Okay. And we understand that.

"THE DEFENDANT: Yes.

"MR. WHITE: I want to understand if you understand what the purpose of a trial is. What's the purpose of a trial?

"MR. O'CONNOR: For the record, I just think we're going over and over stuff.

"THE COURT: I think we are, too.

"MR. O'CONNOR: And I think it's apparent that we may even be confusing Mr. Barnes by going over and over this again and again. And I would want the record to reflect, though, when he said the guard protects us from him, he was laughing, too, which I think is important for the record to show.

"THE COURT: I think, yes, it was an appropriate laughter, because we all laughed as well, so.

. . . .

"MR. WHITE: I've only got two more questions. Do you understand the purpose of the trial?

"THE DEFENDANT: Yes, I mean, that means taking take me through the course of all the evidence, and take me through the course of the district attorney's side. And then the Judge listens to your side. And then the jury goes in and deliberates. And then—

"THE COURT: He's got it.

"MR. WHITE: Okay. Now, let me ask you this: You told us that you wanted Judge Pilshaw to decide this case. Is that correct?

"THE DEFENDANT: Yes.

"MR. WHITE: And you understand that?

"THE DEFENDANT: Yes. I mean. I mean.

"THE COURT: That means that the jury wouldn't be hearing any evidence, it would just be me. Is that all right with you? Is that what you said?

"THE DEFENDANT: Just want to get it over with.

"THE COURT: But there are two ways of doing that, either through the jury or with me hearing it. You told me earlier that you wanted me to decide. Is that what you still want?

"THE DEFENDANT: Yes.

. . . .

"THE COURT: Because I don't want you to do anything if you don't get it, you know. I want you to understand, and I want you to be aware. I don't want you to, I don't want you to feel like anybody is pressuring you into doing anything. I don't want you to feel like we want you to do this, so you have to do this.

"THE DEFENDANT: No, I mean.

"THE COURT: It's what you want to do; right?

"THE DEFENDANT: Yeah, so.

"THE COURT: Okay. Good. You say, sort of, sometimes, and you don't really mean it. It is what you want to do? You're just really confused, aren't you? You want to know what you want to have happen, you just want to get help; right?

"THE DEFENDANT: Right.

"THE COURT: And maybe it seems like it's too much to you. It's really silly that we're going through this, because it seems to me like you think you're guilty, and you just want to move to the next place. Am I right?

"THE DEFENDANT: Right.

"THE COURT: And has it been upsetting to you to go through all this evidence, and stuff like that, when you already know you did it and you just want help; right?

"THE DEFENDANT: Yes, I am.

"THE COURT: See, I understand. Right?

"THE DEFENDANT: Yeah.

"THE COURT: Okay. I accept your waiver."

The participants in the conversation then returned to the courtroom, and the judge stated on the record in open court that she was satisfied Barnes was competent to make the decision to waive his right to jury trial, and she formally accepted his waiver. The judge then proceeded with trial to the bench, and Barnes indicated he wished only to admit a psychiatric evaluation from Dr. John Wisner and a transcript of Craig's interview with his sister, Billingsly. The court admitted both into evidence.

Wisner's report, dated almost 10 months before the beginning of Barnes' trial, concluded that Barnes could not have formed the requisite intent to commit the two charged offenses at the time they were committed. The report said:

"Schizophrenia affects the perception of reality (via delusional convictions and hallucinated communications), and the ability to act independently and make logical decisions (via loss of goal directed activity and logical progression of speech and thinking). Anthony Barnes' symptoms (sexual persecutory, and conjugal delusions and hallucinations with feelings of reference and influence) are among the most painful and most chronic I have encountered in 30 years of clinical practice. He also evidences deficits in logical sequencing of thought and decision-making. Symptoms in this category are well recognized to be among those most frequently associated with unpredictable and random, non purposeful acts of violence. In my professional opinion, with reasonable medical certitude, Anthony R. Barnes currently, for many years since about 1991, and at the time of the shooting which occurred on March 13, 2006, suffers from and has suffered from Chronic Paranoid Schizophrenia. On and about March 13, 2006, his psychotic illness was at it's height in terms of the extent and intensity of symptoms.

"The mental state of Anthony R. Barnes on the evening of March 13, 2006, was marked by the delusional conviction that everyone in his environment was engaged in a concerted effort to belittle, accuse, shame, and persecute him. The intensity of auditory hallucinations was such that he was subject to an insistent barrage of insults, threats, and slurs, and had reason to fear for his physical integrity and his life. He believed, and was being constantly 'told' in the harshest fashion, that he was an object of sexual derision, and that his ex-wife was sexually acting out with 'everybody.'

"Under our State's current legislatively mandated interpretation of mental disease or the effects of mental status on guilt, it is my opinion that Anthony R. Barnes was, at the time of the shooting on March 13, 2006, in a momentary, virtually instantaneous state of inflamed emotion, anger, shame, fear, and a defensive mind set which precluded any premeditation or specific murderous intent against any specific victim. *Mens rea* in the sense of willful, intentional, or however briefly premeditated murder was not possible given [his] mental status at the time."

The State did not present any expert psychological testimony to contradict Wisner's report.

The transcript of Billingsly's interview with Craig contained information about Barnes' diagnosis with paranoid schizophrenia and said that he had not been on his medication for several months before the crimes. Billingsly reported that Barnes had been staying up at night, ranting to himself about how he was going to get on the bus one day and shoot somebody. She said that it was common for Barnes to talk to himself. Several weeks before the shooting, he was talking "crazy" when he walked to church with her and a couple of kids threw a cup at him. He got upset and said he was going to get them and shoot them. She also reported that, 10 days before the shooting, Barnes said he couldn't "take it anymore" and asked his ex-wife to take him somewhere. The police later brought him back to Billingsly's home after finding him walking along the Kansas Turnpike.

The district judge found Barnes guilty of first-degree premeditated murder of Hall and aggravated assault of Cherry. In explaining her verdict, she said that she had reviewed Wisner's report, and it was "very clear that Mr. Barnes ha[d] a long and documented history of mental illness." She continued:

"I respect Dr. Wisner's qualifications and his credentials. However, for him to, many, many months later, try to ascertain what Mr. Barnes' mental state was at the time of the killing, and at the time of the assault, would be—it's simply a conclusion, an opinion based on the information that he was given.

"Hearing his statement to Detective Craig, hearing the things—hearing the observations made of him by the people who were present at the time, those are much more clear in defining, in my mind, in deciding whether or not he was suffering such delusions that would negate that intent.

"The fact remains he did not talk about any delusions. He did not talk about hearing voices. His actions, his demeanor, all of those things, while they are not

the product of a well mind, it is clear to me that he had sufficient state of mind to form the intent required for both of those crimes."

ANALYSIS

### Competency to Waive Jury Trial

Barnes first argues that his lack of competency was evident, and the district judge should have called a halt to the trial on her own initiative and ordered a second competency evaluation, rather than accepting his jury trial waiver and continuing with trial to the bench.

Barnes did not raise this issue before the district court.

"Issues not raised before the district court generally cannot be raised on appeal. Exceptions may be granted if: (1) the newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case; (2) consideration of the theory is necessary to serve the ends of justice or to prevent denial of fundamental rights; or (3) the district court's judgment may be upheld on appeal despite its reliance on the wrong ground." *State v. Foster*, 290 Kan. 696, 702, 233 P.3d 265 (2010) (citing *State v. Shopteese*, 283 Kan. 331, 339, 153 P.3d 1208 [2007]; *State v. Anthony*, 282 Kan. 201, 206, 145 P.3d 1 [2006]).

In *State v. Foster*, this court determined that the issue of competency to stand trial raised due process concerns reviewable even without defendant's pursuit of the issue before the district court. *Foster*, 290 Kan. at 702 (citing *Shopteese*, 283 Kan. at 339; *State v. Harkness*, 252 Kan. 510, 513-17, 847 P.2d 1191 [1993]; K.S.A. 22-3302[1]). We therefore move to the merits of this issue.

Our standard of review is abuse of discretion. See *State v. Hill*, 290 Kan. 339, 366-67, 228 P.3d 1027 (2010) (citing *State v. Kleypas*, 272 Kan. 894, 984, 40 P.3d 139 [2001], *cert. denied* 537 U.S. 834 [2002], *overruled in part on other grounds by State v. Marsh*, 278 Kan. 520, 102 P.3d 445 [2004]); see also *Foster*, 290 Kan. at 703 (defendant's challenge whether trial court should have *sua sponte* ordered competency evaluation reviewed under abuse of discretion). Judicial discretion is abused if judicial action (1) is arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the district court; (2) is based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.*,

if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based. See *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011) (citing *State v. Gonzalez*, 290 Kan. 747, 755-56, 234 P.3d 1 (2010).

K.S.A. 22-3301(1) provides the definition of incompetency to stand trial: "[A] person is 'incompetent to stand trial' when he is charged with a crime and, because of mental illness or defect is unable: (a) To understand the nature and purpose of the proceedings against him; or (b) to make or assist in making his defense." A criminal defendant may not be tried unless he or she " 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . [and] a rational as well as factual understanding of the proceedings against him.' " *Hill*, 290 Kan. at 367 (citing *State v. McKinney*, 265 Kan. 104, 107, 961 P.2d 1 [1998] [quoting *Dusky v. United States*, 362 U.S. 402, 4 L. Ed. 2d 824, 80 S. Ct. 788 (1960)]); see *Harkness*, 252 Kan. at 513.

" ' "[I]f the accused is capable of understanding the nature and object of the proceedings going on against him; if he rightly comprehends his own condition with reference to such proceedings, and can conduct his defense in a rational manner, he is, for the purpose of being tried, to be deemed sane, although on some other subject his mind may be deranged or unsound." [Citations omitted.]' " *State v. Shopteese*, 283 Kan. 331, 341, 153 P.3d 1208 (2007) (citing *Van Dusen v. State*, 197 Kan. 718, 722-23, 421 P.2d 197 [1966]).

Courts presume a criminal defendant is competent to stand trial. *State v. Cellier*, 263 Kan. 54, Syl. ¶ 6, 948 P.2d 616 (1997). The party who raises the issue of competence to stand trial has the burden of going forward with the evidence, and the burden of proof is the preponderance of the evidence standard. 263 Kan. 54, Syl. ¶ 4.

K.S.A. 22-3302(1) provides:

"At any time after the defendant has been charged with a crime and before pronouncement of sentence, the defendant, the defendant's counsel or the prosecuting attorney may request a determination of the defendant's competency to stand trial. If, upon the request of either party *or upon the judge' own knowledge and observation*, the judge before whom the case is pending finds that there is reason to believe that the defendant is incompetent to stand trial the proceedings

shall be suspended and a hearing conducted to determine the competency of the defendant." (Emphasis added.)

Barnes filed his motion to determine his competency to stand trial 17 months before trial began. The district judge ultimately found him competent, based on the report of Dr. Constance D. Gaston, Ph.D./L.C.P., of ComCare. Gaston evaluated Barnes, and his history of mental illness. She noted that Barnes had been a ComCare client since 1998 and had been diagnosed with paranoid schizophrenia and intermittent explosive disorder. Barnes reported to Gaston that he had experienced auditory hallucinations daily since his mid-20s and that he heard screaming, yelling, and talking. He reported that he was often paranoid, thinking others were talking and laughing about him. At the time of the evaluation, Barnes was taking medication and was not hearing voices, and he intended to continue taking his medication. Under these circumstances, Gaston found Barnes' thoughts logical and goal-directed, and she said he was not paranoid or delusional at that time. Barnes understood the role of courtroom personnel and the procedure of trial. He understood the concept of plea bargaining and what he might anticipate if he went to trial. Gaston concluded that Barnes was competent to stand trial.

Barnes does not challenge the district judge's pretrial finding of his competency to stand trial based on Gaston's report. Rather, he argues that the judge should have been willing to restart a competency inquiry based on his behavior during the jury trial waiver proceedings.

In *State v. Foster*, we recognized a trial court judge's independent duty to inquire into a defendant's competency once the judge is on notice of a competency problem: "[T]he failure to hold a competency hearing, when 'evidence raises a bona fide doubt as to defendant's competency, is a denial of due process.'" *Foster*, 290 Kan. at 704 (quoting *State v. Davis*, 281 Kan. 169, 177, 130 P.3d 69 [2006]).

When Barnes' counsel announced, after 2 days of jury trial, that Barnes wanted to waive his right to a jury and continue with a bench trial, the district judge ensured that Barnes had additional

time to discuss his desire with counsel. She then engaged in extensive questioning of Barnes, both in chambers and in open court. Barnes' participation in his private conference with counsel and his responses to the judge's inquiries show intermittent confusion on the roles of the jury and the judge. They also show some indecision on the question of whether the jury or the judge should decide his guilt.

Both *Foster*, 290 Kan. at 705-06, and this court's earlier decision in *State v. Harkness*, 252 Kan. at 510, offer guidance on this issue.

In *Foster*, the defendant pointed to two trial incidents to argue that the district judge should have *sua sponte* ordered a second competency evaluation. The first incident occurred during jury selection, when the defendant indicated that he did not understand the process, and the trial court explained the proceedings. The second incident involved the defendant's expression of confusion over the consequences of testifying. On appeal, the defendant argued that the district judge's effort to educate him was proof that his competency required reevaluation.

This court observed that the record showed the defendant communicating with counsel and the district judge's helpful interjections to improve the defendant's understanding of his circumstances. "The record indicates [the defendant] understood the district court's explanations and signaled his understanding at the district court's and the prosecutor's later behests." *Foster*, 290 Kan. at 706. We went on to hold that the district judge did not abuse his discretion by failing to initiate a further competency evaluation. It was not error for the district judge to take time to explain the proceedings whenever the defendant indicated he did not understand. *Foster*, 290 Kan. at 706.

In *Harkness*, the defendant also argued that the district judge should have *sua sponte* ordered a new competency determination, based on the defendant's behavior at arraignment and trial, his prior psychiatric history, and his ingestion of psychotropic medication to enhance his stability. The defendant had attacked a court reporter during his arraignment, and, at trial, when the jury requested a read-back of testimony, the defendant expressed con-

fusion about his options and whether he should be present for the read-back. He had a difficult time making a choice.

This court first noted that a defendant is not incompetent to stand trial simply because he or she has received or needs psychiatric treatment. *Harkness*, 252 Kan. at 516 (citing *Van Dusen v. State*, 197 Kan. 718, 725-26, 421 P.2d 197 [1966]). We ultimately held that the district judge had not abused his discretion.

"The trial court also had the opportunity to observe Harkness' conduct, attitude, and demeanor at trial. It must be presumed the trial court considered all of this and did not find the defendant's competency wanting. Attacking a court reporter, showing confusion, having difficulty making decisions, and twiddling one's thumbs are not necessarily signs of incompetency. There are other plausible explanations.

" 'It is the trial court in whose mind a real doubt of sanity or mental capacity to properly defend must be created before that court is required to order an inquiry solely on its own initiative. The necessity for an inquiry under such circumstances addresses itself to the discretion of the court and its decision will not be disturbed in the absence of abuse of sound judicial discretion.' " *Harkness*, 252 Kan. at 516-17 (quoting *Van Dusen v. State*, 197 Kan. 718, Syl. ¶ 6, 421 P.2d 197 [1966]).

In this case, when the record is considered holistically, Barnes appears to have had difficulty making his choice between jury and bench trial. But his ambivalence did not necessarily indicate that he was suffering from a psychotic break of some sort. Rather, his indecision appears to have been induced by his realization that he had only unpleasant options. Barnes' counsel and the district judge took far more than the ordinary measures to be certain that Barnes understood the right he was waiving and the effects that waiver would have. Under these circumstances, the district judge did not abuse her discretion when she accepted Barnes' jury trial waiver and continued with the trial to the bench.

*Knowing and Voluntary Waiver of Jury Trial*

Barnes' second argument on this appeal is that he did not fully understand his right to a jury trial and thus could not validly waive it. The State, for its part, distinguishes lack of understanding of the right from indecision on whether to exercise it.

Barnes did not raise this issue in exactly this form before the district court, so we must first address preservation for appeal.

Given Barnes' mental health history, his mere request to waive a jury after 2 days of trial put the issue of his understanding, that is, how knowledgeable and voluntary his waiver could be, front and center for the district judge. It is obvious from her encouragement of Barnes' further discussion with his lawyer and from her extensive personal examination of Barnes that she was well aware of the potential for later disavowal of Barnes' decision as unknowing or involuntary. Indeed, this possibility provided ample motivation for her hypervigilance, and she tried to make a record that would inoculate any decision to accept Barnes' waiver. This course of events makes this case more analogous to *State v. Clemons*, 273 Kan. 328, 338, 45 P.3d 384 (2002), in which the issue was raised in an argument for new trial, than to *State v. Luna*, 271 Kan. 573, 577, 24 P.3d 125 (2001), in which the issue never came up in the district court. See also *State v. Bowers*, 42 Kan. App. 2d 739, 740, 216 P.3d 715 (2009) (Court of Appeals examines waiver of jury trial despite failure to preserve because fundamental right implicated); *State v. Larraco*, 32 Kan. App. 2d 996, 999-1000, 93 P.3d 725 (2004) (same). We therefore consider the issue preserved for our review.

Our prior cases indicate that we employ a substantial competent evidence standard to examine the factual underpinnings of a district court's decision to accept a jury trial waiver. See *Clemons*, 273 Kan. at 340-41 (citing *State v. Irving*, 216 Kan. 588, 589, 533 P.2d 1225 [1975]). When the facts underlying the decision are undisputed, the question of whether a defendant voluntarily and knowingly waived his or her right to a jury trial is one of law, subject to unlimited appellate review. *State v. Duncan*, 291 Kan. 467, 470, 243 P.3d 338 (2010).

Here, the pertinent facts are undisputed. The State has not challenged any of the particulars of Barnes' mental health history, and we have complete transcripts of the events surrounding the jury trial waiver, including everything said by Barnes and his counsel and the district judge. In addition, many of the facts relevant to whether a new competency evaluation should have been ordered are also relevant to the issues of whether Barnes made a knowing and voluntary waiver of his right to a jury trial.

In this case, the district judge acknowledged Barnes' mental health history and stated that she wanted to make sure that mental illness was not affecting his ability to understand his right to jury trial and the importance of waiving that right. The district judge proceeded to educate Barnes, informing him that, in a jury trial, the jury would decide his guilt or innocence while the court would determine his sentence. She went on to explain that, once he waived a jury, he could not change his mind before the trial concluded. After an additional brief colloquy between Barnes and the district judge, Barnes asked to speak with his attorney. The district judge immediately granted this request.

During Barnes' conversation with his attorney, Barnes stated that he understood that he had a right to a trial by a jury. Barnes joked that his "brain's not working this morning." Immediately, his attorney said, "I don't want to feed you information. I want to make sure you understand what's going on." Barnes then said that he understood he had been in jury trial for the last couple of days, meaning a jury would decide whether he was guilty or innocent. He also said that his defense was one of mental defect or disease and that the jury would be asked a special question to determine whether he should serve his sentence in a hospital because of his mental illness. When defense counsel asked Barnes if he knew where he was "right now," Barnes said he was "in left field." He then explained that he knew he was in the judge's library and that he had been joking. Barnes next explained the functions of the parties involved in the trial. He stated that the jury listened to all the evidence and decided whether he was guilty and that the judge also listened to all the evidence and made her decision based on what the jury said.

During Barnes' conversation with the judge in chambers, Barnes initially expressed some confusion over the roles of the judge and jury. But, when asked specifically about what the jury was charged with deciding, he correctly answered that jurors determined guilt and innocence. When the judge asked him who would decide his guilt or innocence in a bench trial, he correctly answered that the judge would do so. Barnes then expressed ambivalence about who would decide that issue in his case, saying he was guilty of the

crime. The judge then informed Barnes again the she would determine guilt or innocence if he surrendered his right to a jury. Barnes said he understood that.

Barnes' attorney again asked Barnes if he understood that he had a right to have a jury decide his case, and Barnes said he did. Barnes' attorney told Barnes that everyone would do what he wanted to do and would not do what he did not want to do. To this, Barnes responded that he did not know what he wanted to do; he just wanted to "get it over with" because he was guilty and very sorry for what he did. Again, the district judge asked Barnes if he wanted her to decide his guilt or innocence, and Barnes said yes. Then the judge said:

"I don't want you to do anything if you don't get it, you know. I want you to understand, and I want you to be aware. I don't want you to, I don't want you to feel like anybody is pressuring you into doing anything. I don't want you to feel like we want you to do this, so you have to do this."

The judge then asked Barnes a final time if he wanted to waive his jury trial, and Barnes confirmed that he did.

In *Johnson v. State*, 271 Kan. 534, 536, 24 P.3d 92 (2001), the defendant argued that he did not waive his right to a jury trial because he was "borderline" developmentally disabled and had no understanding of waiving his right to jury trial. This court reviewed the record and found that substantial competent evidence supported defendant's waiver. 271 Kan. at 537. Johnson stated on the record that he wanted to waive his right to a jury trial. At the pretrial hearing, the district court asked him if he had enough time to make his decision and whether he felt pressured to make the decision, to which Johnson replied he was not pressured and had enough time. Johnson stated he felt more confident in the judge than in the jury.

Likewise, in this case, the district judge explained a defendant's right to jury trial more than once to Barnes. She gave Barnes ample time to discuss his understanding of his rights and his decision with both his attorney and with her. Barnes' lawyer made clear that Barnes was in control, and the judge emphasized that Barnes should not feel pressured to choose one way or the other, that

either choice would be acceptable. Barnes participated fully in the conversations and made the decision to waive his right, even joking appropriately at times. The record on appeal shows a man who was fed up with the sometimes tedious and painful procedure necessary to get to a result and, in Barnes' case, to get to the mental health treatment he knew he needed. On these facts, we see no error in accepting Barnes' knowing and voluntary waiver of his jury trial right.

Before leaving this issue, one final point bears mention. Barnes' reliance on appeal on Wisner's report does nothing to alter our view. Barnes did not submit this report to the district judge until after his jury trial waiver was accepted. But, even if the report had been in evidence at the time the waiver was being discussed, it stated that Barnes was "aware of the charges against him, the likely outcome if found guilty, the role of his defense attorney, the prosecutor, the judge, and a jury. He could identify the main types of evidence relevant to his case." In short, there is no reason to believe that it would have prevented the district judge from accepting Barnes' waiver.

*Sufficiency of Evidence to Support Requisite Mental State*

Barnes also argues on appeal that the district judge erred by disregarding uncontested expert medical evidence and substituting her own judgment on the question of Barnes' mental capacity to form the requisite intent. In his view, as a matter of law, the State cannot overcome a mental disease or defect defense supported by expert testimony unless it sponsors contrary expert testimony. This argument, at base, raises a sufficiency of evidence question.

The "standard of review when sufficiency of the evidence is challenged following conviction in a criminal case is whether, after reviewing all the evidence, viewed in a light most favorable to the prosecution, we are convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Martinez*, 290 Kan. 992, 1003, 236 P.3d 481 (2010) (citing *State v. Gant*, 288 Kan. 76, 83, 201 P.3d 673 [2009]); see *State v. Makthepharak*, 276 Kan. 563, 569-70, 78 P.3d 412 (2003). This court does

not weigh the evidence or reassess witness credibility. *State v. Trussell*, 289 Kan. 499, 503, 213 P.3d 1052 (2009).

Under K.S.A. 22-3220, "[i]t is a defense to a prosecution under any statute that the defendant, as a result of mental disease or defect, lacked the mental state required as an element of the offense charged." See *State v. Pennington*, 281 Kan. 426, 434-35, 132 P.3d 902 (2006) (mental disease or defect negates intent element of crime). The statute does not require any particular form of proof to support or combat the defense. And Barnes has not directed us to any other authority. Our own search has not revealed any authority for Barnes' argument that a factfinder must inevitably give more weight to after-the-fact psychological expert opinion on a defendant's mental state than to lay eyewitness testimony about the defendant's behavior at the time of the crime.

This court has stated:

"Kansas courts recognize intent is very difficult to establish. See *State v. Lassley*, 218 Kan. 758, 762, 545 P.2d 383 (1976) (It is very 'difficult, if not impossible, to show [intent] by definite and substantive proof.'). . . .

"But intent may be inferred from ' "acts, circumstances, and inferences reasonably deducible therefrom.' " *State v. Salcido-Corral*, 262 Kan. 392, 398, 940 P.2d 11 (1997) (citing *State v. William*, 248 Kan. 389, 402, 807 P.2d 1292, *cert. denied* 502 U.S. 837 [1991])." *State v. Martinez*, 290 Kan. 992, 1004, 236 P.3d 481 (2010).

This case is similar to *State v. Pratt*, 255 Kan. 767, 769, 876 P.2d 1390 (1994), in which the defendant similarly argued that the testimony of his expert witness established his inability to form the requisite intent necessary for conviction. There the factfinder weighed the expert testimony against the other evidence presented and found the defendant guilty. We found that there was sufficient evidence from which the fact-finder could conclude that the State met its burden of proof on the intent element. *Pratt*, 255 Kan. at 770-71. Thus we affirmed the conviction.

"When sitting as the trier of fact, a judge has the right to observe the conduct of a witness in the courtroom and to consider that in weighing the testimony." *State v. Anderson*, 243 Kan. 677, 679, 763 P.2d 597 (1988); see *State v. Graham*, 273 Kan. 844, 853, 46

P.3d 1177 (2002). It is not the task of an appellate court to reweigh the evidence before the district court. *Graham*, 273 Kan. at 853.

In this case, the district judge did not ignore Wisner's report. In fact, she explicitly described the consideration that she gave it. She merely regarded it as less persuasive than evidence coming from multiple eyewitnesses at the scene of the shooting and from the detective who took Barnes' statement immediately after his arrest. The testimony of these witnesses painted Barnes as calm. According to them, there was no external, observable evidence that Barnes was hearing voices or was compelled to commit the crimes by those voices. The district judge was entitled to base her verdict on this admissible evidence, which was sufficient to support a finding that Barnes possessed the necessary mental state to commit the crimes.

*Reliance on Criminal History Score*

Barnes argues that the district judge's use of his prior convictions to enhance his sentence without requiring the State to prove his prior convictions to a jury beyond a reasonable doubt was prohibited under *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000).

This court has previously ruled against Barnes on this issue. See *State v. Ivory*, 273 Kan. 44, 46, 41 P.3d 781 (2002).

There was no error on this ground.

*Aggravated Sentence for Aggravated Assault*

Barnes also challenges his aggravated assault sentence because, under *Apprendi*, any fact used to increase a defendant's sentence must be proved to a jury beyond a reasonable doubt, and this rule should cover imposition of the upper term in the range assigned to a presumptive grid box under the Kansas Sentencing Guidelines Act.

Barnes acknowledges that we rejected this argument in *State v. Johnson*, 286 Kan. 824, 190 P.3d 207 (2008). He asks this court to reconsider and overrule *Johnson*. We decline to do so.

CONCLUSION

In view of all of the foregoing discussion, defendant Anthony

Ray Barnes' convictions and sentences for first-degree premeditated murder and aggravated assault are affirmed.